## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 06 2018, 6:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

A.D.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner*

September 6, 2018

Court of Appeals Case No.
18A-JV-127

Appeal from the LaPorte Circuit Court

The Honorable Thomas J. Alevizos, Judge

The Honorable W. Jonathan Forker, Magistrate

Trial Court Cause No.
46C01-1708-JD-431

**Vaidik, Chief Judge.**

# Case Summary

[1] A.D. admitted committing neglect of a dependent resulting in serious bodily injury, a Level 3 felony if committed by an adult, for shaking his newborn daughter and causing extensive injuries, and the juvenile court made him a ward of the Indiana Department of Correction. A.D. now appeals the juvenile court's disposition. Because of the violent nature of A.D.'s actions in this case and the fact that he has a history of running away and not completing services, we affirm the juvenile court.

# Facts and Procedural History

[2] A.D., who was born in January 2001, grew up in Tennessee with his mother. After living off and on in homeless shelters for many years, A.D.'s mother placed him in the custody of the Tennessee Department of Children's Services, where he was offered numerous services including therapy, counseling, and drug and alcohol treatment. While in the custody of the Tennessee Department of Children's Services, A.D. ran away from his placements three times (one residential placement and two different foster placements). The last time A.D. ran away was in June 2016, when he was fifteen years old. He landed in Indiana, where he met nineteen-year-old Jasmine Watson at a party. Jasmine lived in Michigan City with her grandmother and several other people.

[3] Shortly after meeting each other, in October 2016, A.D. moved in with Jasmine. Soon thereafter, Jasmine became pregnant. A.D. and Jasmine's

daughter, I.W., was born on July 26, 2017.  A few weeks later, Jasmine started working in a bakery; A.D. watched I.W. while Jasmine worked.

[4]   On August 30, 2017, when I.W. was thirty-five days old, Jasmine was at work when she received a call that I.W., who was in A.D.'s care, was unresponsive and being taken to Franciscan Health Michigan City.  I.W. was then airlifted to Lurie Children's Hospital of Chicago, where it was determined that I.W. suffered brain injuries consistent with shaken baby syndrome.  Specifically, I.W. had bleeding in numerous areas of her brain, lost some brain tissue, and had extensive bleeding behind her eyes.  According to I.W.'s neurologist, it was "the worst case of shaken baby he'[d] ever seen in his career."  Tr. p. 13.  After spending one month at Lurie Children's Hospital, I.W. was transferred to Memorial Hospital of South Bend, where she stayed for three more weeks.  The "general prognosis" for I.W. is that she will never be able to talk or walk, is most likely blind, and hopefully one day will be able to swallow (until then, she's being continuously fed by a G-tube).  *Id.* at 16.  I.W. also takes medicine for seizures.[1]

[5]   In September 2017, the State filed a petition alleging that sixteen-year-old A.D. was a delinquent child for committing what would be Level 3 felony neglect of a dependent resulting in serious bodily injury if committed by an adult.  The State later filed a motion for waiver of jurisdiction to adult court.  Before that

---

[1] I.W., who requires twenty-four-hour care, was placed with Jasmine's parents.

motion was ruled on, however, A.D. admitted the allegation, and the State dismissed its waiver petition.

[6]     A dispositional hearing was held in December 2017. At the hearing, Calvin Buntyn, A.D.'s Tennessee family service worker, testified that A.D. should be sent to a secure facility. He emphasized A.D.'s failure to complete services in Tennessee as well as the likelihood that he'll run away again:

> I believe that he's . . . a run risk. He's a threat to run. He's a risk to run. I believe that – just based on my year working with [A.D.], if he has the opportunity to run, he's gonna run.

Tr. pp. 174-75. Lynn Rowe, A.D.'s counselor at the LaPorte County Juvenile Services Center (where A.D. had been housed since the incident in this case), testified about A.D.'s anger issues:

> His behavior goes up and down. He does lose his temper when he does not get his way or is told that he cannot do something. He hits walls and pounds, you know, with his fist against the walls and doors, cusses at staff. . . . He's been on administrative shut down for his extreme anger issues and impulsivity.

*Id.* at 204. Finally, Stasi Benning, A.D.'s probation officer, testified that A.D. scored a "high-risk level" on the Indiana Youth Assessment System (IYAS) and that she recommended that A.D. "be committed to the [DOC] for housing at the Indiana Boys School." *Id.* at 184. Benning explained that numerous services would be available to A.D. in the DOC, including individual and group services, substance-abuse treatment, mental-health services, and schooling

(including the opportunity for A.D. to earn a GED and an associate's degree). *Id.* at 190, 201. According to Benning, the DOC offered more services than a residential treatment facility. *Id.* at 201. In response, A.D.'s attorney argued that A.D. should not be made a ward of the DOC but rather "release[d] . . . on conditions to participate in the services he may need." *Id.* at 215.

[7] Following the dispositional hearing, the juvenile court ordered that A.D. be made a ward of the DOC. Appellant's App. Vol. III p. 28. The court reasoned:

> [T]here's a vast array of services available at the [DOC], which . . . I don't know if it will, but can meet the needs that have been expressed, and I think more so than any other possibility. Not in the community. And, [A.D.] hasn't expressed through his Tennessee actions, a willingness to engage in services. He hasn't shown an ability to engage in services when left to his own devices out in the community. And Ms. Benning said, even more so in terms of services available at DOC than any other location, and she believes that, essentially, given the history with DCS in Tennessee, that the services have been exhausted that could otherwise be provided . . . in the community. Those have been exhausted. And no, there's no lengthy delinquency history, but I think we can't forget the reason we're here is because [A.D.] left Tennessee for a long, long period of time. His mother did not know. His father did not know. His foster home parents did not know. DCS in Tennessee did not know. Nobody knew. And in terms of the best – I think under those circumstances, his **best interests** . . . lie with the services that are available and can be provided at the [DOC]. I think the **safety of the community** is also a factor here, notwithstanding there's no history of actual delinquency behavior, et cetera, but we have this case, the delinquent finding in this case, which certainly, was a violent act. We have Ms. Rowe also saying that there's still some anger issues that are

below the surface here, and come to the surface from time to time, as exhibited by her testimony on things that have occurred at the Juvenile Services Center.

Tr. pp. 223-24 (emphases added).

[8] A.D. now appeals.

# Discussion and Decision

[9] A.D. contends that the juvenile court abused its discretion by making him a ward of the DOC. He believes that the "least restrictive" and "most appropriate" placement is "therapeutic including GPS with services, therapy, educational services and additional substance abuse treatment . . . ." Appellant's Br. p. 14.

[10] The goal of the juvenile process is rehabilitation rather than punishment. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). "Accordingly, juvenile courts have a variety of placement choices for juveniles who have delinquency problems, none of which are considered sentences." *Id.* Indiana Code section 31-37-18-6(1)(A) provides that "[i]f consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that . . . is . . . in the least restrictive (most family like) and most appropriate setting available." Although options less harsh than commitment to an institution are available for the juvenile court to use, "there are times when commitment to a suitable public institution is in the 'best interest' of the juvenile and of society." *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App.

2005) (quotation omitted). "Stated differently, the law requires only that the disposition selected be the least restrictive disposition that is 'consistent with the safety of the community and the best interest of the child.'" *Id.* (quoting Ind. Code § 31-37-18-6). The specific disposition of a delinquent child is within the juvenile court's discretion. *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006). We will reverse only for an abuse of discretion, namely a decision that is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[11] Here, the juvenile court made A.D. a ward of the DOC based on the safety of the community and his best interests. Regarding the safety of the community, the juvenile court explained that although A.D. did not have a lengthy delinquency history, he had anger issues, and the offense involving his daughter was "violent." That is, A.D., who admitted shaking thirty-five-day-old I.W., Tr. p. 149, caused her to have bleeding in numerous areas of her brain, extensive bleeding behind her eyes, and a loss of brain tissue. A.D. has permanently disabled his daughter: I.W. will never be able to talk or walk, is most likely blind, and will only be able to swallow food if speech therapy is successful. According to the neurologist, this was the worst case of shaken baby syndrome he had ever seen. This alone supports the juvenile court's disposition in this case.

[12] But there is more. A.D.'s poor history with less restrictive alternatives also supports the juvenile court's disposition. That is, A.D. ran away from one residential placement and two foster placements in Tennessee. Although A.D.

received services in Tennessee, he did not complete them. Consequently, A.D. scored a "high-risk level" on the IYAS. Given A.D.'s failure to engage in community services and the "vast array of services available at the [DOC]," the juvenile court found that it was in his best interests to be placed in the DOC. This was not an abuse of discretion. Accordingly, we affirm the juvenile court.[2]

[13] Affirmed.

Riley, J., and Kirsch, J., concur.

---

[2] A.D. raises an additional argument on appeal. After admitting to the offense, A.D. filed a motion for emancipation, which the juvenile court denied when it made him a ward of the DOC. A.D. argues that the court should have granted his motion for emancipation. The State responds that A.D.'s placement in the DOC "renders his emancipation claim moot." Appellee's Br. p 13. Because the juvenile court made A.D. a ward of the DOC, it did not abuse its discretion in denying his motion for emancipation. In fact, A.D.'s trial counsel seemed to condition the request for emancipation on the assumption that the court would release A.D. and not send him to the DOC. *See* Tr. p. 215.