v.

STATE of Indiana, Appellee–Petitioner.

No. 71A03–1003–JV–206.

Court of Appeals of Indiana.

Nov. 12, 2010.

Elizabeth Hardtke, South Bend, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Wade James Hornbacher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

In the instant case, we are asked to determine whether a juvenile court abused its discretion when it awarded guardianship of a juvenile who had been adjudicated a delinquent child to the Indiana Department of Correction (DOC). Although juvenile courts have a variety of placement options for juveniles who have delinquency

problems, Indiana Code section 31–37–18–6 imposes one important restriction, namely, that a juvenile court select the least restrictive placement that is "consistent with the safety of the community and the best interest of the child."

Appellant-respondent R.H. appeals the juvenile court's disposition order awarding guardianship of him to the DOC, arguing that there was a less restrictive alternative available. Concluding that R.H.'s placement with the DOC is justified by the two instant adjudications, his behavior while in detention and on electronic monitoring, his pattern of inappropriate sexual conduct, and his family's inability or refusal to address his inappropriate sexual conduct, we affirm the decision of the juvenile court.

### FACTS[1]

On August 23, 2009, fourteen-year-old R.H. left a K–Mart store in St. Joseph County without paying for a pair a sunglasses and was apprehended by a security officer. On October 16, 2009, the State filed a petition under cause number 71J01–0910–JD–647 (JD–647), alleging that R.H. was a delinquent child for committing an act that would constitute class A misdemeanor conversion if committed by an adult.

On October 27, 2009, R.H. approached I.R. in the school cafeteria and made inappropriate sexual statements. I.R. ignored R.H. and he left; however, after lunch, he walked up to I.R. and grabbed her breast. A hall monitor, who was a few feet away, attempted to stop R.H., but he ran away.

After fleeing the hall monitor, R.H. was observed on the school's security camera harassing another female student. He put his arm around her, and when she tried to push him away, he walked behind her and "began using a pelvic grind on her buttocks and laughing." Appellant's App. p. 48.

R.H.'s parents were ordered to pick up their son from school. R.H.'s father told the school's resource officer that he "could not understand what his son had done wrong" and indicated "that it was not a crime to grab the girl by the breast." *Id.* He explained that in Gary, where the family was from originally, it is an "accepted" practice. *Id.* R.H.'s mother became so disruptive that an additional officer had to be summoned to the school and she withdrew her son permanently.

Based on the incident involving I.R., on November 5, 2009, the State filed a petition alleging that R.H. was a delinquent child for committing an act that would have been battery, a class B misdemeanor, if committed by an adult under cause number 71J01–0910–JD–673 (JD–673). R.H. was held in custody until the December 8, 2009, delinquency hearing, during which time he had many disciplinary problems and was placed in administrative segregation.

At the December 8, 2009, delinquency hearing, R.H. was adjudicated a juvenile delinquent in JD–673 and was released with electronic monitoring. However, after only nine days, he absconded and was returned to custody.

On December 21, 2009, R.H. admitted the allegations in JD–647 pursuant to an agreement under which the State agreed not to file additional petitions for mischief and disorderly conduct. R.H. was again

1. We heard oral argument on October 19, 2010, in the courtroom of the Indiana Supreme Court. We would like to thank counsel for their able presentations and the Carmel High School students who attended the argument for their presence and respectful demeanor. Additionally, we want to express our appreciation to the administration, technology support, and staff of the Indiana Supreme Court for their assistance.

released to electronic monitoring until he was returned to custody on or about January 25, 2010, for continuing to "engage in delinquent behaviors." *Id.* at 41–42. While in custody, R.H. had a total of twenty-five incident reports.

On February 9, 2010, R.H. submitted to a psychosexual-psychological assessment because of the sexual nature of his actions towards I.H. and the unknown female recorded by the school's security camera. During the assessment, R.H. admitted to engaging in a number of sexual acts with his four-year-old cousin on three separate occasions. Additionally, R.H. disclosed a number of other inappropriate sexual behaviors with different individuals that were "likely forced" and with his brothers. *Id.* at 64. R.H. also reported being molested around the age of three or four by an older female.

On March 23, 2010, the juvenile court held a dispositional hearing and awarded guardianship of R.H. to the DOC for assignment to a Boys' School. The juvenile court relied, in part, on the recommendation of the probation department. R.H. now appeals.

### DISCUSSION AND DECISION

R.H. argues that the juvenile court abused its discretion when it awarded guardianship of him to the DOC when there was a less restrictive disposition available. Specifically, R.H. contends that he should have been placed "in a residential type setting so that he could receive treatment as opposed to punishment." Appellant's Br. p. 8.

As an initial matter, we observe that the purpose of the juvenile process is vastly different from the criminal justice system. *Jordan v. State*, 512 N.E.2d 407, 408 (Ind.1987). Specifically, the goal of the juvenile process is *rehabilitation* so that the youth will not become a criminal as an adult. *Id.* Accordingly, juvenile courts have a variety of placement choices for juveniles who have delinquency problems, none of which are considered sentences. *Id.*

The disposition of a juvenile adjudicated a delinquent is a matter committed to the sound discretion of the juvenile court, subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy favoring the least harsh disposition. *E.H. v. State*, 764 N.E.2d 681, 684 (Ind.Ct.App. 2002). On review, we may overturn the juvenile court's disposition order if we find that it abused its discretion, which occurs if its actions are clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences that may be drawn therefrom. *Id.*

Indiana Code section 31–37–18–6 provides:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

R.H. directs our attention to *D.P. v. State*, in which a panel of this Court deter-

mined that the juvenile court abused its discretion when it awarded guardianship of D.P. to the DOC. 783 N.E.2d 767, 771 (Ind.Ct.App.2003). The *D.P.* Court based its decision on two factors, namely, D.P.'s special circumstances and Indiana's policy favoring the least harsh disposition. *Id.* at 769–70.

As for D.P.'s special circumstances, the panel noted that D.P.'s IQ was only sixty-five and that he had been held back in his third and fourth grade school years. *Id.* at 770. Similarly, although D.P. was beginning the ninth grade, he performed at either a third- or fifth-grade level. *Id.* Additionally, D.P. was being medicated for ADHD, which is characterized by unusually impulsive behavior. *Id.*

As for Indiana's policy favoring the least harsh disposition, the *D.P.* Court acknowledged that placement with the DOC may still be appropriate even if less restrictive alternatives are available. *Id.* Nevertheless, the *D.P.* Court concluded that those were not the circumstances with which it was presented because *D.P.* was not unresponsive to less restrictive alternatives, inasmuch as his only other contact with the juvenile justice system was his successful completion of probation following a battery adjudication. *Id.* at 770–71. Accordingly, the *D.P.* Court concluded that juvenile court should have suspended D.P.'s confinement with the DOC. *Id.* at 771.

R.H. also relies on *E.H.*, in which a panel of this Court vacated a juvenile court's dispositional decree after concluding that there were less restrictive options than a one-year commitment to the DOC. 764 N.E.2d at 686. E.H. had been adjudicated a delinquent child for committing an act that would have constituted class D felony theft if committed by an adult. *Id.* at 682. The *E.H.* Court opined that E.H.'s involvement with the juvenile justice system was, in part, because of his parents'

abuse and neglect. *Id.* at 686. Indeed, E.H.'s first contact with the juvenile justice system occurred when he brought a handgun to school that he intended to use on himself because his situation at home had become intolerable to him. *Id.* at 685.

The *E.H.* Court concluded that there was a placement alternative that was less restrictive than commitment to the DOC, namely, allowing E.H. to continue in foster care under the Dawn Project, which was a program assisting E.H. and his family with reunification and home-based counseling. *Id.* at 686. The *E.H.* Court observed that commitment to the DOC conflicted with the rehabilitative goals of the juvenile justice system, inasmuch as E.H.'s counselor testified that he had made considerable progress and that removing him would cause him to regress. *Id.*

R.H. argues that his circumstances are similar to those in *D.P.* and *E.H.* and that, consequently, this Court should vacate the juvenile court's dispositional decree granting guardianship of him to the DOC. Specifically, R.H. contends that like D.P., he has not engaged in repetitive misconduct and that the juvenile court erroneously emphasized that he had a prior history with the juvenile court. Likewise, R.H. highlights the fact that he has never been placed on probation and that his drug screen was negative. Accordingly, R.H. maintains that he has not been unresponsive to less restrictive alternatives. Moreover, R.H. points out that like D.P., he has special circumstances that this Court should consider, namely, his below-average IQ of seventy-five and the sexual molestation he suffered at the tender age of three or four years.

Additionally, R.H. argues that similar to *E.H.*, placement with the DOC was not the least restrictive alternative, inasmuch as R.H. could have been provided services "through the Probation Department with

the assistance of the in-patient counseling at a residential treatment facility." Appellant's Br. p. 10. Furthermore, R.H. contends that like E.H., he is in need of services rather than punishment and points out that placement at a residential facility serves both his interests and those of the community because he would be housed in a secure facility while he and his family receive intense family counseling.

Although it appears that R.H. has no prior adjudications and that his most recent drug screen was negative, he has certainly exhibited behaviors of a very troubled young man. More particularly, the record indicates that eight days after R.H. was arrested for stealing sunglasses from K–Mart in August 2009, the assistant principal reported that R.H. and another student left school. When a police officer tried to stop R.H., he resisted three times, but was eventually returned to school. The following day, when a teacher stopped R.H. and asked for identification, R.H. fled school property again. He was apprehended and returned to school, but quickly became disruptive and was transported to the police department.

Several weeks later, the police were contacted after R.H. had broken three windows of his home and ran away. The police located R.H. and observed that he was bleeding and carrying a metal pole. R.H. told the officers that he acted out because he was angry at his father.

In December 2009, R.H. was placed on electronic monitoring, but after an argument with his father, he unplugged his ankle monitor and left his house. R.H. was quickly detained and was released to his parents, but on January 25, 2010, he was detained again.

During his periods of detention, R.H. demonstrated a number of behavioral problems. Specifically, R.H. received a number of incident reports for failure to follow staff instruction, peer conflict, disrespect to staff and peers, manipulation, disorderly conduct, threats toward staff, gang promotion, aggressive behavior, possession of contraband, instigating trafficking, and teasing/bullying.

As for substance abuse, in November 2009, R.H. reported that he consumed alcohol once per month and smoked marijuana every two weeks. An evaluation of R.H.'s substance use reportedly met the criteria for cannabis abuse although further evaluation was needed to rule out alcohol abuse and cannabis dependency.

The most troubling is R.H.'s history of inappropriate sexual conduct, particularly in light of the sexual nature of the instant battery. Specifically, on at least three occasions, R.H. has had sexual contact with his four-year-old cousin. See W.C.B. v. State, 855 N.E.2d 1057, 1063 (Ind.Ct.App. 2006) (concluding that molestation occurs, regardless of the perpetrator's age, when one engages in the specified conduct, with the requisite criminal intent, with a child under the age of fourteen). Similarly, R.H. has engaged in a number of other inappropriate sexual behaviors with different individuals that were "likely forced." Appellant's App. p. 64. And several of R.H.'s sexual encounters have been incestuous, including encounters with his brother and half-brother.

Moreover, we agree with the State that R.H.'s "parents are at best merely enablers and at worst complacent in their son's inappropriate and unlawful behavior." Appellee's Br. p. 7. For instance, R.H.'s father indicated that he did not believe that his son had done anything wrong when he grabbed I.R.'s breast and stated that it was "accepted" behavior. Id. at 48. Likewise, R.H.'s mother responded to the incident by becoming angry with

school officials, disruptive, and permanently withdrawing her son from school.

As stated above, Indiana Code section 31–37–18–6 states that placement in the least restrictive setting is required only "[i]f consistent with the safety of the community and the best interest of the child." Furthermore, this Court has recognized that "in certain situations the best interest of the child is better served by a more restrictive placement." *K.A. v. State*, 775 N.E.2d 382, 387 (Ind.Ct.App.2002).

In this case, R.H.'s placement with the DOC is justified by the two instant adjudications, his behavior while in detention and on electronic monitoring, his pattern of inappropriate sexual conduct, and his family's inability or refusal to address his inappropriate sexual conduct. Indeed, R.H. is in need of intense rehabilitation while he is still a juvenile and before his delinquent conduct becomes criminal. Consequently, the juvenile court did not abuse its discretion when determined that it was in R.H.'s best interests to remove him from his family and place him in the DOC.

Nevertheless, R.H. directs this Court to a report created by the U.S. Department of Justice (the Report) involving sexual victimization in juvenile detention facilities. The Report was presented as Exhibit A during R.H.'s dispositional hearing on March 23, 2010. According to the Report, Pendleton Juvenile Correctional Facility (Pendleton), where R.H. is currently located, was one of the thirteen juvenile facilities out of 195 that had "an overall victimization rate that could be identified as high," and it had a victimization rate of 30% or greater. Ex. A p. 4–5.

R.H. uses the Report to argue that because he has been a victim of sexual molestation, "[a] more appropriate disposition would have been for [him] to live free from sexual abuse in a residential type setting." Appellant's Br. p. 9. R.H. also asserts that placement at Pendleton is punitive and "exposes children to an environment of sexual victimization." *Id.*

While the Report tends to indicate that Pendleton has issues with sexual victimization of the juveniles who are detained there, it fails to establish that the juvenile court abused its discretion by awarding guardianship of R.H. to the DOC. To be sure, it is the DOC, rather than the juvenile court, which determined where R.H. would be placed. Consequently, this argument must fail,[2] and we affirm the decision of the juvenile court.

The decision of the juvenile court is affirmed.

NAJAM, J., and VAIDIK, J., concur.

---

**2.** We do not intend for our conclusion to imply that victimization in a juvenile facility could never be grounds to challenge placement in that facility. We recognize that the Fourteenth Amendment to the United States Constitution protects individuals who are confined by the State from being held in unsafe conditions. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *see also Ratliff v. Cohn*, 693 N.E.2d 530, 547 (Ind.1998) (concluding that juvenile's complaint stating that she had been subjected to hostility and threats by adult inmates and feared for her safety and had been sexually propositioned by older inmates was sufficient to raise a Due Process Clause violation under *Youngberg* and survived a motion to dismiss). However, R.H. does not allege that he has been victimized or threatened, and as stated above, it is the DOC, not the juvenile court, that is responsible for his placement. Moreover, it is our hope that the Executive Department is as concerned with this unchallenged revelation as we are.