## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2019, 7:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Lake County Juvenile Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.F., <br> *Appellant-Respondent*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner*. | January 31, 2019 <br><br> Court of Appeals Case No. 18A-JV-2016 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Robert G. Vann, Magistrate <br><br> The Honorable Thomas P. Stefaniak, Judge <br><br> Trial Court Cause No. 45D06-1801-JD-15 |

**Brown, Judge.**

[1] J.F. appeals the juvenile court's dispositional order awarding wardship of him to the Department of Correction (the "DOC") for housing in any correctional facility for children. J.F. raises two issues which we revise and restate as:

I. Whether J.F. received ineffective assistance of counsel; and

II. Whether the juvenile court abused its discretion when it awarded wardship to the DOC.

We affirm.

## *Facts and Procedural History*

[2] On January 16, 2018, a pizza was ordered to be delivered to the Merrillville, Indiana, apartment of J.F., born on December 1, 2002. J.F. was armed with a deadly weapon, to wit a "B.B. gun," threatened Javier Guana, Jr., the pizza delivery driver, with the gun and to use force against him, and took $50.00 from Guana. Transcript at 4.

[3] On January 19, 2018, the State filed a delinquency petition under cause number 45D06-1801-JD-15 ("Cause No. 15"), alleging J.F. committed what would be a level 3 felony if committed by an adult. On the same day, a Probation Officer Hearing Report was filed which states J.F. "has a lengthy history with this court," he "is currently before this Court for a detention hearing for the Armed Robbery-Complaint #6," "[t]his is his 6th Delinquency with a 7th is [sic] pending," "[p]robation has been advised by the prosecutor[']s office that there will be an 8th Complaint for Armed Robbery as well which hasn't been entered

into QUEST yet."[1]  Appellant's Appendix Volume II at 61.  The report further states that J.F.'s "prior history with the court is Complaint #5 (Unauthorized Entry of a Motor Vehicle) opened as of 12/12/17," that J.F. was "currently on In-House Detention, Level 2," that his "first involvement with a delinquency in this court was when he was 12 years old," and that he had returned from living with his aunt in Florida and been in Indiana for two days before he was arrested "for Complaint #4 in Lake County."  *Id.* at 61-62.  The report indicates that J.F. denied any involvement with gangs although he has previously self reported to be involved with the Gangster Disciples and that he had a history of being involved with a gang along with his older brother.  It states that J.F. has had eleven positive drug screens while on probation supervision, that he tested positive for marijuana on December 11, 2017, that J.F.'s home frequently smells of marijuana, and that J.F. has presented as "being very high with erratic behaviors."  *Id.* at 62.  It observes that, during the intake also on December 11, 2017, J.F. stated "he only used marijuana when he needed to 'calm down'," he stated he uses maybe once every three months, and when asked how old he was when he first tried marijuana he stated he had never used.  *Id.*  It further states J.F.'s monitor has "shown Master Tamper on multiple occasions," he had admitted to messing with the monitor, and that "[a]fter inspection, it was clear that [J.F.] had tampered with his monitor."  *Id.*

---

[1] In his appellant's brief, J.F. states that "[t]here were also additional charges pending under a separate cause number for an additional charge of Armed Robbery."  Appellant's Brief at 5 (citing Appellant's Appendix Volume II at 5, 62-63).

[4]     On June 19, 2018, the juvenile court held an omnibus hearing, at which J.F. tendered a plea of guilty in Cause No. 15 and the court found an adequate factual basis and adjudicated J.F. delinquent of the act of armed robbery, a level 3 felony, if committed as an adult. The State moved to dismiss cause numbers 45D06-1712-JD-755 and 45D06-1801-JD-25, and the court granted the motions and dismissed the cases. The court then asked counsel, "[a]re we prepared to go to Disposition, or do I need to order a Pre-Dispositional Report, and set it for Disposition," J.F.'s counsel stated, "[i]t was our intent to proceed today, Judge," and the prosecutor agreed. *Id.*

[5]     The Court then asked for "[r]ecommendations, Probation," and Beth Lynn Rechlicz testified:

> Your Honor, packets were sent to multiple residential facilities, including SEQUEL, Gibault's, Wernle, White's (Wabash), Rite of Passage (South Bend), Rite of Passage (Hillcrest), Youth Villages, um, and all of these facilities have denied [J.F.] into their program. They felt that he was not amenable to treatment; therefore, probation is recommending Department of Corrections. We're asking that [J.F.] remain detained pending transportation, as he's a danger to the community and unlikely to appear for future hearings. We're asking that [J.F.] be released from probation as failed. Um, prior to his successful release from the Department of Corrections, probation recommends that he participate in TRP services through NYAP. We feel that [J.F.] has displayed an unwillingness to participate in services that have been provided through this court. We're asking for DOC.

*Id.* at 7-8. At the conclusion of Rechlicz's statement, J.F.'s counsel asked to cross-examine her, the court asked the State if it had any recommendations that

"differ from those," and the State replied in the negative and stated that it "would agree with probation at this time." *Id.* at 8. Rechlicz later indicated during her examination by J.F.'s counsel that she did not interview any staff members at the Lake County Juvenile Detention Center and that the staff members "provide[d] a report, which I placed in . . . the body of my report." *Id.* at 10.

[6]     J.F. presented the testimony of Eric Hamilton, assistant director of Juvenile Services for the Lake County Juvenile Detention Center, who indicated that he saw and had contact with J.F. every week since he was "detained on 12/11/2017." *Id.* at 13. When asked to describe how J.F. had been doing, Hamilton stated:

> On February 22nd, 2018, [J.F.] was named in an incident where he would not follow directions, and continued to try and take supplies from the therapist that comes in that works with the residents. On . . . February 26th, 2018, [J.F.] was named in an incident where he attempted to steal the pencil lead from a pencil he was using during class. Upon returning the pencil, when class was over, Detention Officer noticed that the pencil was damaged, and missing a portion of the lead. [J.F.] eventually returned the lead after not telling the truth and stating that he threw it away. On March 11th, 2018, [J.F.] was named in an incident where he went into another resident's room and threw all the blankets and the mattresses on the floor. When the resident was told to go down and clean his room, [the staff] was unaware that [J.F.] had messed it up, and [J.F.] ran down to the room and attacked this

resident.[2]  When confronted, [J.F.] stated that they were shadow boxing and that . . . it wasn't anything serious; however, sayer (sic) resident was sent on a medical run to the E.R. and visible swelling and bruising was left to, was left to his left eye.  Staff was later advised by other residents present on the POD at that time that the altercation started because [J.F.] was attempting to bully this resident for his snacks.  This resident confirmed that he was being bullied by [J.F.].

*Id.* at 13-14.  When asked whether J.F. has "progressed, has he gotten better since being in your facility," Hamilton stated:

Uh, yes, sir.  He's turned it around.  He's taken advantage of our programs.  He's currently on Phase 4.  Uh, when he first came in, he was a little reckless, he was hardheaded, but now I think [J.F.] has matured a little bit, and he assists staff now; he's become more of a role model in the back; and his progress has become positive.

*Id.* at 14.  After additional questioning, J.F.'s counsel asked Hamilton if he had recommendations for the court and Hamilton stated, "Um, well, I would have to concur with probation at this time, um, but I do believe [J.F.] has made leaps and bounds, has become a better individual, and if given a second chance, I believe he will do good in society."  *Id.* at 15.

---

[2] The transcript indicates that Hamilton testified "When the resident was told to go down and clean his room, [J.F.] was unaware that he had messed it up, and [J.F.] ran down to the room and attacked this resident."  Transcript Volume II at 14.  A copy of a Resident Behavioral Overview for J.F., dated June 18, 2018, states with regard to the March 11, 2018 incident that "[w]hen [the other resident] was told by staff to go down and clean his room, as they were unaware [J.F.] as [sic] messed it up, [J.F.] ran down to the room and jumped [the other resident]."  Exhibits Volume at 4.

[7] During cross-examination, Hamilton testified that J.F.'s last incident in the juvenile center occurred on May 26, 2018, that he "was named in an incident where he came into the possession of contraband that had been smuggled into the facility," that "[i]t was recorded on camera that resident was going to Room H-104 on Hotel Pod, that individual bent over and grabbed something that was placed under the door by a weekend resident showering next door, and passed it to [J.F.], while he was in Room H-105," and that it "was never confirmed exactly what was passed to [J.F.]." *Id.* at 17. When the prosecutor later asked Hamilton if he felt that J.F. was still aggressive, he stated that J.F. becomes aggressive in certain situations, "but overall, his attitude has changed from when he first came here." *Id.* at 18. He answered affirmatively to the question "[b]ut he's still getting himself in to situations that are against the rules of LCJC" and stated that J.F. had at least six infractions since he had been in the facility. *Id.* At the conclusion of Hamilton's testimony, J.F.'s counsel indicated he "was going to call mom" to testify, and Keshuna Billingley testified she thought J.F. had learned a lesson and was asking if he could come home. *Id.* at 19.

[8] At the conclusion of J.F.'s evidence, his counsel asked that the court place him on probation supervision and the probation department requested placement at the DOC when asked by the court to respond. On July 20, 2018, the court issued a dispositional order in which it awarded wardship of J.F. to the DOC for housing in any correctional facility for childen, found it was in J.F.'s best interests to be removed from the home environment and that remaining in the

home would be contrary to his welfare because he was engaging in dangerous behaviors which jeopardize his physical and mental health, and recommended that the DOC determine if he "meets criteria according to DOC policy to be placed on parole supervision." Appellant's Appendix Volume II at 139.

## Discussion

### I.

The first issue is whether J.F. received ineffective assistance of counsel. J.F. argues that he received ineffective assistance during the June 19, 2018 omnibus hearing when his counsel waived the pre-dispositional report and proceeded to disposition with no prepared report "other than []Rechlicz's probation reports which contain[ed] information on placements that were four months old." Appellant's Brief at 8. According to J.F., his outcome "may have been substantially different" but for counsel not waiving the pre-dispositional report. *Id.*

J.F. maintains that his counsel's performance be assessed under the two-prong standard found in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*, but contends it would also fail under a due process standard "which states that 'if counsel appeared and represented the petitioner in a procedurally fair setting which resulted in a judgment of the court, it is not necessary to judge his performance by rigorous standards.'" Appellant's Brief at 7 (quoting *A.M. v. State*, 109 N.E.3d 1034, 1041 (Ind. Ct. App. 2018) (quoting *Jordan v. State*, 60 N.E.3d 1062, 1068 (Ind. Ct. App. 2016)), *reh'g denied*, *trans. pending*.

[11] Observing that Indiana courts have not squarely addressed whether the *Strickland* test or the due process test is the proper test to be used in analyzing the effectiveness of juvenile counsel during the various phases of delinquency proceedings, *see A.M.*, 109 N.E.3d at 1041 (noting the same), and without deciding that juveniles in the various phases of delinquency proceedings are entitled to application of the same assistance of counsel standards as those applied in adult criminal cases, we find that J.F. did not receive ineffective assistance of counsel.

[12] Even reviewing counsel's representation under the *Strickland* standard, which both parties agree is more stringent than the due process alternative, we cannot say that J.F. received ineffective assistance. Generally, to prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland*, 466 U.S. 668, 104 S. Ct. 2052). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001) (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). Failure to satisfy either

prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[13] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

[14] Initially, we note the contrast between a reasonable probability, defined as "a probability sufficient to undermine confidence in the outcome," *Perez*, 748 N.E.2d at 854 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068), and J.F.'s own position when he asserts that his outcome "may have been substantially different" had counsel not waived the report. Appellant's Brief at 8. Moreover, while J.F. argues that his trial counsel's waiver of the pre-dispositional report

resulted in the lack of a report other than Rechlicz's probation reports, Hamilton, the assistant director of Juvenile Services for the Lake County Juvenile Detention Center, where J.F. had been housed for the months preceding the dispositional hearing, ultimately recommended placement in the DOC. Under these circumstances, we cannot say that J.F. has demonstrated that he was prejudiced.

## II.

[15] The second issue is whether the juvenile court abused its discretion in awarding wardship of J.F. to the DOC for housing in any correctional facility for children. The juvenile court is given "wide latitude and great flexibility" in determining the specific disposition for a child adjudicated a delinquent. *D.A. v. State*, 967 N.E.2d 59, 65 (Ind. Ct. App. 2012). However, its discretion is circumscribed by Ind. Code § 31-37-18-6, which provides:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> > (1) is:
> >
> > > (A) in the least restrictive (most family like) and most appropriate setting available; and
> > >
> > > (B) close to the parents' home, consistent with the best interest and special needs of the child;
> >
> > (2) least interferes with family autonomy;
> >
> > (3) is least disruptive of family life;

(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

"Under the statute, placement in 'the least restrictive (most family like) and most appropriate setting available' applies only '[i]f consistent with the safety of the community and the best interest of the child.'" *J.D. v. State*, 859 N.E.2d 341, 346 (Ind. 2007) (quoting Ind. Code § 31-37-18-6).

A disposition will not be reversed absent a showing of an abuse of the juvenile court's discretion, which occurs when the juvenile court's order is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences that can be drawn therefrom. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010).

J.F. argues that he did not have the benefit of availing himself of services and showed himself to be amenable to treatment while detained. He contends that his family did not cooperate with probation to obtain "those services in place which may have made a difference." Appellant's Brief at 10. He also asserts that the adjudication and dispositional hearings were held almost four months after the packets for residential placements had been sent out and subsequently rejected, that the new information "provided by Hamilton and the other witness" as to how J.F.'s behavior and attitude had changed while detailed could have been relevant had updated packets been sent out, and that a less

restrictive placement could have been found had probation provided updated information to the placements. *Id.* at 11.

[19] The State maintains that the DOC is the best option based on J.F.'s history of felony level offenses and probation violations. The State contends in part that the current delinquency petition against J.F. was its sixth; that two other delinquency petitions were filed against him while he was in the juvenile detention center, one of which involved another armed robbery; and that he committed six infractions while in the juvenile facility. It contends further that probation had proven unsuccessful because J.F. continued committing delinquent acts and tampered with his ankle monitor.

[20] The January 19, 2018 Probation Officer Hearing Report states J.F. was serving in-house detention, that his first involvement with a delinquency occurred at age twelve, and that his prior history involved a fifth complaint opened as of December 12, 2017, for unauthorized entry of a motor vehicle. It states that the delinquency alleged in Cause No. 15 was his sixth, that a seventh delinquency was pending, and that the prosecutor's office had advised the probation department that there was an eighth complaint for armed robbery which had not yet been entered into QUEST. It states he had self-reported involvement with the Gangster Disciples and had a history of being involved with a gang along with his older brother, had tested positive for marijuana on December 11, 2017, as well as in eleven drug screens while on probation supervision, had denied marijuana usage after having admitted it, and had admitted to messing with his monitor.

[21] J.F. tendered a plea of guilty in Cause No. 15, and the court adjudicated him delinquent of armed robbery, a level 3 felony, if committed as an adult and dismissed cause numbers 45D06-1712-JD-755 and 45D06-1801-JD-25. During the hearing that followed, the probation department recommended placement in the DOC, the State indicated it "would agree with probation," and, when asked during examination if he had recommendations for the court, Hamilton stated he "would have to concur with probation at this time, um, but I do believe [J.F.] has made leaps and bounds." *Id.* at 8, 15. Hamilton also testified to J.F.'s behavior and involvement in four incidents in the Lake County Juvenile Detention Center. We note that the last of these incidents occurred less than a month prior to the June 19, 2018 omnibus hearing and that the March 11, 2018 incident resulted in a resident being sent to the E.R. and in visible swelling and bruising to his left eye.

## *Conclusion*

[22] Under these circumstances and in light of J.F.'s prior history of delinquent behavior, we conclude that the disposition ordered by the juvenile court, which awarded wardship of J.F. to the DOC and recommended a determination of whether he met criteria to be placed on parole supervision, is consistent with his best interest and the safety of the community. We find no abuse of discretion.

## *Conclusion*

[23] For the foregoing reasons, we affirm the juvenile court's order.

[24] Affirmed.

Bailey, J., and Bradford, J., concur.