## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2019, 10:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

A.K.,
*Appellant*,

v.

State of Indiana,
*Appellee*.

October 17, 2019

Court of Appeals Case No.
19A-JV-1110

Appeal from the Miami Superior
Court

The Honorable Daniel C. Banina,
Judge

Trial Court Cause No.
52D02-1706-JD-15

**Brown, Judge.**

[1] A.K. appeals the juvenile court's dispositional order. He raises two issues which we revise and restate as whether the court denied him due process or abused its discretion in awarding wardship of him to the Indiana Department of Correction (the "DOC"). We affirm.

## Facts and Procedural History

[2] In June 2017, the State filed a Petition Alleging Delinquency which alleged that A.K., who was born in August 2002, committed two acts of child molesting which would constitute level 3 felonies if committed by an adult. On August 23, 2017, the court held a hearing at which A.K. admitted to the allegations contained in one of the counts and the court dismissed the other count. A.K. admitted that he knowingly submitted to sexual conduct with B.C.N., a person he knew was eleven years old, and the conduct was video recorded using a school laptop. The parties stipulated to the admission of the probable cause affidavit for purposes of supplementing the factual basis. According to the affidavit, school staff discovered video recordings on B.C.N.'s school-issued laptop, the recordings depicted B.C.N. and his fourteen-year-old half-brother A.K. exposing themselves, and in one of the recordings, B.C.N. performed oral sex on A.K. The court found A.K. to be delinquent and ordered that he be placed at White's Residential and Family Services in its sexually maladaptive youth program.

[3] The juvenile court held review hearings on November 22, 2017, and February 21, 2018, and ordered that A.K. remain at White's Residential. On May 16, 2018, the court held a review hearing at which A.K's probation officer testified

that A.K. had not progressed very quickly in treatment, his behavior was not easy to manage, he had "been mouthy with staff," he snuck a turtle and a frog into his room, he was "defiant in general," and that, despite multiple warnings to stop "horse playing with other residents," he climbed on someone, fell, and broke his arm, resulting in surgery. Transcript Volume II at 23. The court did not change A.K.'s placement and told him that "the longer you decide to not go with the program, . . . the longer you're going to be there or someplace else." *Id*. at 26. On August 15, 2018, the court held a review hearing at which the prosecutor indicated that he had been notified that White's Residential was considering removing A.K. from its program and that he anticipated a violation would be filed.

[4] On August 17, 2018, the State filed a petition for modification of dispositional decree alleging that A.K. violated the conditions of his probation by failing to obey all terms and conditions of programming at White's Residential resulting in unsuccessful termination from the program. The modification report stated that A.K. had been placed at White's Residential for almost one year, he was placed in the sexually maladaptive youth program, he was refusing to complete treatment, and that his behaviors had escalated to the point he was no longer manageable at White's Residential. On August 22, 2018, the court held a hearing at which A.K. admitted that he failed to comply with the terms and conditions of the program. He admitted there were five major offenses between July 3rd and July 23rd, including that he was "out of bounds" twice, hit a peer in the groin, sharpened a crochet hook into a weapon, and brought unapproved

items back from campus visitation. *Id*. at 36. The court found that A.K. violated his probation by being unsuccessfully discharged from White's Residential and ordered that he be temporarily placed at the Robert J. Kinsey Youth Center. On August 29, 2018, the court held a placement hearing at which it was informed that A.K. had been accepted at Oaklawn, the Children's Campus. On September 13, 2018, the court issued an agreed order on placement that A.K. be released from Kinsey to Oaklawn for the purpose of residential placement.

[5] On December 17, 2018, A.K.'s probation officer filed a placement review and attached October and November 2018 monthly treatment reports. A report dated November 1, 2018, states that A.K. made minimal progress and that there were thirteen incidents to report in the period, including that on October 14th and 25th, he was physically aggressive toward staff, on October 15th he was not following unit structure and used a paper towel with paint on it to cover up the safe room window and attempted to push past staff which resulted in a restraint, on October 25th he attempted to engage in property destruction and tied clothing around his neck resulting in a restraint and seclusion, on October 7th and 20th he engaged in self-harm behaviors, on October 16th he attempted to elope, on October 9th and 11th he punched a wall until his knuckles bled and was treated by the nurse, and on October 27th he had to review the rules of masturbation with staff after telling them he went over shower time because he was masturbating in the shower. A report dated December 1, 2018, states that A.K. made minimal progress and that there were

ten incidents to report in the period, including that on November 17th he attempted to engage in property destruction but was stopped by staff, on November 8th, 13th, and 30th he engaged in physical aggression toward staff, on November 15th, 19th, and 26th he engaged in property destruction behaviors, on November 30th he tied a shirt around his neck, on November 6th he attempted to be physically aggressive towards a peer, and on November 27th he refused to go to his room when directed, during the incident saw a female staff member's cleavage, and later told a peer about the incident and engaged in inappropriate sexual talk.

[6] On December 19, 2018, the court held a placement review hearing at which A.K.'s probation officer testified that, until the previous two or three weeks, A.K. "was doing pretty horribly," that she "was receiving multiple incident reports daily regarding his behavior, [] destroying property, being out of bounds, [] some inappropriate sexual activities, [and] blatant back talk," and "he just seems to have turned it around here recently." *Id.* at 50. She indicated that, in the prior two weeks, she received one or two incident reports. She indicated that, in order for him to make progress towards returning home, he had to follow the rules, that he was in "group B" which was very structured for those who had been causing a lot of trouble in the group environment, that "he's got to get some of those restrictions off," and "he is working towards doing that by participating." *Id.* at 50-51. She indicated that A.K. had a weighted blanket for two weeks, that it helped him with his anxiety, there are times he wraps himself up in it so that just his face is out, and that he talked

about how it helped him to think before he acts. The court ordered that A.K. remain at Oaklawn.

[7] On March 15, 2019, the State filed a Verified Petition for Modification of Dispositional Decree alleging that A.K. had failed to obey all terms and conditions of programming at Oaklawn resulting in unsuccessful termination from the program. On March 20, 2019, the court held a modification hearing. The court asked A.K.'s counsel if there was an objection to A.K. being placed in secure detention pending further hearing, and counsel stated that ultimately they knew that was what was going to happen but that it was important for the representative from Oaklawn to testify as to what went wrong. A.K.'s care facilitator at Oaklawn testified that A.K. was unsuccessfully terminated from its program and that they had done a lot of creative thinking with him and placed extra support to help him be successful. She testified that A.K.'s therapist talked to him about the programming and they determined that he made poor choices because he wanted to continue receiving extra attention.

[8] The care facilitator testified that the first four months of A.K.'s treatment related to teaching him coping skills so that he could manage his anxiety and they then started to work on his trauma which he was not interested in doing. She testified that he completed perhaps a month of his treatment at most and showed very little if any motivation. When asked if she saw unsafe behavior that morning just outside the courtroom, she replied affirmatively and stated that, when they were telling him "here's what's going on" and "you've made some poor choices," his first response was to punch the limestone wall. *Id.* at

63. She also testified that A.K. engaged in self-harm behaviors, took pieces of clothing and wrapped them around his throat, and engaged in some suicidal ideation. She indicated he is currently passing classes but is struggling behaviorally in school, has been suspended multiple times, and there was an incident in February where someone asked him to do something and he refused and stayed on the classroom floor for ten or fifteen minutes. She stated that A.K. was not advancing or taking advantage of the services at Oaklawn.

[9] A.K.'s probation officer recommended that A.K. be transferred to Kinsey and that an additional hearing be set. His counsel asked the probation officer about A.K.'s grandmother as an alternative family placement, and the officer indicated that she could speak with the grandmother and noted that she had concerns with A.K. being placed in a less restrictive setting. The court placed A.K. in secure detention at Kinsey pending the dispositional hearing.

[10] On April 8, 2019, A.K.'s probation officer filed a predispositional report. The report states that A.K. and his parents would like him to be released to his grandmother's custody on home detention. It states that A.K. had been in residential placement since 2017, lacks social skills, struggles with peer relations and is often defiant with adults, has struggled in the school setting since the first grade, was expelled for the first time in the fifth grade, and has continued to struggle in the school setting in residential placement. The report states that A.K. has been diagnosed with post-traumatic stress disorder, conduct disorder, adolescent onset type, and attention deficit hyperactivity disorder, that he has a history of sexually maladaptive behaviors, he is also a victim of sexual abuse,

his level of sexual recidivism is high and he has a high level of treatment needs, and he is prescribed a number of medications. It states that he participated in a psychosexual evaluation prior to placement at White's Residential, was unsuccessfully discharged from there and from Oaklawn, and he received treatment for sexually maladaptive youth at both placements. It states that A.K. was inpatient at Michiana Behavioral Healthcare in the fifth grade due to being out of control at home and participating in gang activity at school and remained at the facility for one week. The report states: "It should be noted this offense occurred while the first matter was pending. This resulted in the juvenile being placed in secure detention." Appellant's Appendix Volume III at 64. It states that he received thirty-five incident reports in total while at Oaklawn.

[11] The probation officer wrote that, although she appreciates the family's desire to have A.K. return home, she continued to be concerned with the safety of other children, that A.K.'s grandmother is quite ill and will be away from the home to undergo treatment, that the grandmother has a close relationship with the other children and allowing A.K. to live in her home will result in the other children being punished by not being allowed contact with their grandmother, and that driving through the neighborhood she counted nine young children outside playing unsupervised. With respect to placement at the DOC, the report states that A.K. continues to be a high risk to reoffend and that, based on his lack of improvement, failure to complete treatment, and extreme defiance, it is the probation officer's opinion that placement at the juvenile division of the DOC is

the only viable placement. The report finds that A.K. is a danger to himself and others.

[12] On April 10, 2019, the court held a dispositional hearing. A.K.'s probation officer testified that she received an email from Kinsey that morning containing a detention center review memo which indicated that, during the prior two days, A.K. had been dropped four levels due to behaviors in school, he was caught visiting unauthorized websites, was not doing his work, and was drawing inappropriate pictures. She recommended that A.K. complete the sex offender program through the DOC, and that until he works through that program he will continue to be a high risk to reoffend. She indicated the family indicated it did not want A.K. as far away as Tennessee at a potential facility and that she recommended that he complete the sexually maladaptive youth program at the Indiana Boy's School.

[13] The court stated its belief that A.K. continued to be a danger to the community, that he had been in two programs with minimal to no improvement, that he continues to be a high risk, and that "he's basically ran the gamut, gauntlet" and "it's time to place at Indiana Boy's School" with the recommendation that he complete the sexually maladaptive youth program. Transcript Volume II at 92.

[14] The court issued a dispositional order awarding wardship of A.K. to the DOC for housing in a correctional facility for children. The order states in part:

The Court finds this disposition is consistent with the safety and the best interest of the child and is the least restrictive and most appropriate setting available close to the parents' home. Further, this disposition least interferes with the family's autonomy, is least disruptive of family life, imposes the least restraint on the freedom of the child and the child's parent(s); and provides a reasonable opportunity for participation by the child's parent(s). The Court finds the child is in need of care and rehabilitation which can best be provided by his commitment to the [DOC]. Prior attempts at rehabilitation through less restrictive means, including residential placement, home based counseling, and probation supervision have been unsuccessful.

Appellant's Appendix Volume II at 11. The court recommended that A.K. be placed in a facility where he can continue with his education, receive mental health counseling, receive sexually maladaptive youth treatment, and participate in a behavior modification program.

### *Discussion*

[15] A.K. argues that the State failed to produce any evidence of the terms of his probation and that the juvenile court violated his right to due process in modifying the dispositional order. He further argues the court abused its discretion in committing him to the DOC, the State did not investigate or improperly rejected less restrictive placements, and his misconduct and circumstances did not justify a modification resulting in his commitment to the DOC. The State responds that it sufficiently proved that A.K. understood the terms and conditions that he was supposed to follow and that the factfinder could infer that he was made aware of the rules at Oaklawn. It argues that A.K. was given the opportunity to try placements at facilities other than the

DOC, that the facilities dismissed him from their programs due to his continued behavioral problems and failure to make significant progress in treatment, and that, by the time the court placed him with the DOC, it had no other alternative.

[16]  The standard for determining what due process requires in a particular juvenile proceeding is "fundamental fairness." *D.A. v. State*, 967 N.E.2d 59, 64-65 (Ind. Ct. App. 2012). A.K.'s care facilitator testified at the March 20, 2019 modification hearing regarding A.K.'s behavior which included destruction of property and attempts to hurt others and himself and ultimate discharge from Oaklawn, and A.K.'s counsel questioned his probation officer about possible placement with his grandmother. Later, on April 8, 2019, A.K.'s probation officer filed a predispositional report reflecting the officer's thorough consideration of placement with A.K.'s grandmother and the officer's opinion that placement with the DOC is the only viable placement. At the April 10, 2019 hearing, A.K. and his parents were present, and his counsel cross-examined his care facilitator and probation officer and made arguments on his behalf. A.K. has not shown that he was denied fundamental fairness or due process. *See D.A.*, 967 N.E.2d at 65 (observing D.A.'s probation officer explained the reasons for the department's recommendation, D.A. and his mother were present, his counsel presented argument, and the proceeding did not violate fundamental fairness); *S.L.B. v. State*, 434 N.E.2d 155, 157 (Ind. Ct. App. 1982) (noting S.L.B. was well aware of the purpose for which she was

called before the court, she was present for the hearing, her position was expressed through her counsel, and fundamental fairness was served).

[17] The juvenile court is given wide latitude and great flexibility in determining the disposition of a delinquent child. *D.A.*, 967 N.E.2d at 65. However, its discretion is circumscribed by Ind. Code § 31-37-18-6, which provides that, "[i]f consistent with the safety of the community and the best interest of the child," the juvenile court shall enter a dispositional decree that is "in the least restrictive (most family like) and most appropriate setting available" and "close to the parents' home, consistent with the best interest and special needs of the child"; least interferes with family autonomy; is least disruptive of family life; imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and provides a reasonable opportunity for participation by the child's parent, guardian, or custodian. Under the statute, placement in the least restrictive and most appropriate setting available applies only "[i]f consistent with the safety of the community and the best interest of the child." *J.D. v. State*, 859 N.E.2d 341, 346 (Ind. 2007) (citing Ind. Code § 31-37-18-6). We will not overturn the juvenile court's disposition order absent an abuse of discretion, which occurs if its actions are clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences that may be drawn therefrom. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010).

[18] The juvenile court heard testimony from A.K.'s probation officer and care facilitator at Oaklawn and was able to review the filed incident reports and dispositional report. It heard evidence regarding his behavior, treatment,

placement history, and the reasons for his dismissal from the programs, and it considered the parties' arguments. In its order awarding wardship of A.K. to the DOC for housing in a facility for children, the court indicated that it had considered among other factors the interests of A.K. and the public, alternatives for the care, treatment, and rehabilitation for A.K., the necessity, nature, and extent of the participation by a parent, guardian, or custodian in a program of care, treatment, or rehabilitation for the juvenile, and services if any that should be ordered for the parents or guardian. The court reviewed A.K.'s history of placements and found that less restrictive options are not appropriate.

[19] Based upon the record, and in light of A.K.'s delinquent behavior and failure to adequately respond to prior attempts at rehabilitation, we conclude that the placement ordered by the juvenile court is consistent with his best interest and the safety of the community and find no abuse of discretion. *See D.E. v. State*, 962 N.E.2d 94, 97 (Ind. Ct. App. 2011) (holding the juvenile court did not abuse its discretion in placing D.E. in a DOC facility even though there was a less restrictive option available where earlier attempts to rehabilitate his behavior were unsuccessful); *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002) (holding the juvenile court did not abuse its discretion in placing K.A. at the DOC where previous less restrictive placements were unsuccessful and continued placement at a residential treatment center was apparently no longer an available option), *trans. denied*.

[20] For the foregoing reasons, we affirm the juvenile court's order.

[21] Affirmed.

Altice, J., and Tavitas, J., concur.