## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 02 2020, 8:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Litany A. Pyle
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.G., <br> *Appellant-Respondent,* <br><br> *v.* <br><br> State of Indiana, <br> *Appellee-Petitioner.* | October 2, 2020 <br><br> Court of Appeals Case No. 20A-JV-369 <br><br> Appeal from the Montgomery Circuit Court <br><br> The Hon. Harry A. Siamas, Judge <br><br> Trial Court Cause No. 54C01-1903-JD-89 |

**Bradford, Chief Judge.**

# Case Summary

In April of 2019, thirteen-year-old B.G. was found to be a juvenile delinquent for committing Level 6 felony possession of a narcotic drug and placed on supervised probation. In June of 2019, the juvenile court revoked B.G.'s probation because he had stolen several items, smoked spice, possessed homemade weapons, and threatened his three-year-old cousin with harm. The juvenile court ordered B.G. to complete a rehabilitative program at Gibault, Inc. Over the course of the next six-and-one-half months, B.G.'s behavior worsened as he, *inter alia*, assaulted Gibault staff members and other residents, caused a great deal of damage to a classroom, and made little progress in his education or Gibault's program. After a review hearing in January of 2020, the juvenile court ordered B.G. committed to the Indiana Department of Correction ("DOC") until the age of twenty-one or until DOC discharged him. B.G. contends that the juvenile court abused its discretion in ordering him committed to DOC. Because we disagree, we affirm.

# Facts and Procedural History

On March 11, 2019, it was discovered that B.G. had stolen many items from his mother and stepfather, including a watch, a mobile telephone, money, jewelry, and a wallet. B.G. was also found to be in possession of hydrocodone tablets. On March 25, 2019, the State filed a delinquency petition, alleging that B.G. had committed what would be Class A misdemeanor theft and Level 6 felony possession of a narcotic drug if committed by an adult. On April 22, 2019, B.G. admitted that he had been in possession of a narcotic drug, was

adjudicated a juvenile delinquent, and was placed on supervised probation for nine months. B.G.'s terms of probation included a substance-abuse evaluation and treatment, mental-health counseling, community-service hours, "moral reconation" therapy, and participation in "at least one positive prosocial activity per day/week[.]" App. Vol. II p. 59.

[3] On May 29, 2019, the State alleged that B.G. had violated the terms of his probation by stealing a candy bar from his community service location, stealing money from his parents, possessing and smoking spice, possessing multiple homemade weapons, and threatening to harm his three-year-old cousin, who lived in his home. On June 25, 2019, the juvenile court revoked B.G.'s probation and ordered that he be removed from his parents' home and placed in residential care at Gibault. B.G. was ordered to participate in and successfully complete the program at Gibault.

[4] Gibault's program typically takes six to nine months to complete, and B.G. was expected to participate in three phases of the program in order to successfully complete it. B.G. was provided services and "work[ed] on his emotional regulation, just his anger, aggression, impulsive behaviors, communication skills[.]" Tr. Vol. II p. 30. B.G. received individual therapy "at least once a week" and family therapy once a month. Tr. Vol. II p. 32. Despite the services he received, B.G. continued to misbehave while at Gibault and failed to make progress in his services.

[5] When B.G. arrived, "he struggle[d] with some minor incidents" such as sneaking out of his dormitory and "peer negativity[.]" Tr. Vol. II p. 24. At a

January 17, 2020, review hearing, approximately six and one-half months after B.G.'s placement at Gibault, the juvenile court heard evidence indicating that, although B.G. had progressed to the second phase of the program, he had been placed in a "step-back stage" due to lack of progress. Tr. Vol. II p. 30. The second stage of the program required B.G. to invest in his treatment goals and apply what he had learned in the program. Instead, B.G. had assaulted a staff member and his peers and was destructive. B.G. had cause significant damaged to a classroom by poking the ceiling tiles such that there was "debris everywhere in the classroom [.]" Tr. Vol. II p. 31. As a result, the other students had been evacuated from the classroom, and B.G. had continued destroying the ceiling tiles "until he finally decided he was done[.]" Tr. Vol. II p. 37. B.G.'s behaviors had included crawling around in the hallways, sneaking into other classrooms, running out to the parking lot, threatening to run across the street, and "[g]iving staff a hard time." Tr. Vol. II p. 36.

[6] Moreover, B.G. performed poorly academically, did not appear to care about his education, and exhibited the majority of his behavioral issues while in his classes. B.G. was "very aware of the rules and regulations" and knew "the limits he [could] push until staff [would] get involved" and would stop just before staff became involved. Tr. Vol. II pp. 33. When staff asked B.G. why he was engaging in bad behaviors, he would "shrug[] and often [say] I don't know." Tr. Vol. II p. 33. Due to his poor behavior, B.G. was not allowed any home passes during his time at Gibault, and his completion of the program was "taking him longer than most." Tr. Vol. II p. 31.

[7] B.G.'s mother had informed the juvenile court that she did not believe that the program at Gibault was meeting B.G.'s needs. B.G.'s mother opined at the review hearing that B.G. needed consequences for his actions that he was not receiving at Gibault because B.G. "knows that they're a hands-off facility and [she] believe[d] that [B.G.] pushes it[.]" Tr. Vol. II p. 41. B.G.'s mother indicated that she wants the best for him and that "Gibault is not the best place for him for the simple fact that [B.G.] thinks he is in control[.]" Tr. Vol. II p. 41. B.G.'s mother also did not believe she could handle him if he were to be sent home.

[8] Following the January 17, 2020, hearing, the juvenile court concluded that Gibault was not the most appropriate placement for B.G.:

> We've tried probation. We've tried leaving you at home. We've tried Gibault's, which is a very good facility and usually works for most kids and nothing has worked so far. So, the only thing left to us at this point is a very structured place where if you misbehave then the consequences are really serious and if you misbehave then it ends up meaning time.

Tr. Vol. II pp. 45–46. The juvenile court ordered that B.G. be committed to DOC until twenty-one years old or until discharged and informed B.G. that he would be provided with an education, counseling, and "other services that are aimed at making sure [he] stay[s] out of trouble." Tr. Vol. II p. 46.

# Discussion and Decision

[9] B.G. contends that the juvenile court abused its discretion in ordering him committed to the DOC. A juvenile court is accorded "wide latitude" and "great flexibility" in its dealings with juveniles. *J.S. v. State*, 881 N.E.2d 26, 28

(Ind. Ct. App. 2008). "[T]he choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion." *Id.* The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition. *Id.* An abuse of discretion occurs when the juvenile court's action is "clearly erroneous" and against the logic and effect of the facts and circumstances before it. *Id.*

[10] The goal of the juvenile process is rehabilitation rather than punishment. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). "Accordingly, juvenile courts have a variety of placement options for juveniles with delinquency problems, none of which are considered sentences." *Id.* Indiana Code section 31-37-18-6(1)(A) provides that "[i]f consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that is in the least restrictive (most family like) and most appropriate setting available." "[T]he statute contains language that reveals that a more restrictive placement might be appropriate under certain circumstances." *J.S.*, 881 N.E.2d at 29. The law requires only that the disposition selected be the least restrictive disposition that is "consistent with the safety of the community and the best interest of the child." *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005).

[11]   Given the evidence heard by the juvenile court, we conclude that its commitment of B.G. to DOC does not constitute an abuse of discretion. At the age of thirteen, B.G. was found to be in possession of hydrocodone tablets and stolen items. Following his adjudication as a juvenile delinquent, B.G. was placed on probation, and his behavior, if anything, worsened. B.G. violated the terms of his probation by stealing a candy bar, stealing money from his parents, smoking spice, possessing several handmade weapons, and threatening to harm his three-year-old cousin. As a result, the juvenile court ordered B.G. be placed with Gibault for a three-phase program expected to last from six to nine months, where he was to receive services including education and therapy, focusing on his anger, impulsive and aggressive behavior, and communication skills. Initially, B.G. struggled, sneaking out of his dormitory and exhibiting peer negativity. Things only got worse from there.

[12]   Six and one-half months into the Gibault program, while B.G. had progressed to the second phase, his worsening behavior had caused him to be placed in a step-back stage. The second phase required B.G. to invest in his treatment goals and apply what he had learned, but he chose not to do so. Instead, B.G. engaged in violent and destructive behavior, assaulting a staff member and some of his peers and causing significant damage to a ceiling in one of his classrooms. B.G. would also crawl in the hallways, sneak into classrooms that here not his, run into the parking lot, threaten to run across the street, and generally give the staff "a hard time." Tr. Vol. II p. 36. B.G. was well aware of Gibault's rules and regulations and that it was a hands-off facility, causing him

to push the limits and leading him to believe that he was in control. There is ample evidence in the record that B.G.'s time at Gibault, if anything, had resulted in further regression. Having heard this evidence, the juvenile court noted that neither placing B.G. at home, on probation, nor at Gibault had worked and concluded that B.G. required structure that he had not yet received and where he would suffer real consequences for his actions. Under the circumstances, we cannot say that the juvenile court's placement of B.G. with DOC, which would provide that structure and those consequences, amounts to an abuse of discretion.

[13] B.G. alleges that the juvenile court failed to consider the totality of the circumstances and properly assess recommendations from credible witnesses. The record does not support B.G.'s allegation. Four witnesses testified at B.G.'s review hearing and expressed concerns with B.G.'s behavior in residential care and his lack of progress in his services. Though B.G.'s case manager at Gibault stated that B.G. could remain in the program because they do not give up on children unless they become a liability, she acknowledged that B.G. was not doing well in the program and was not making progress. B.G.'s case manager believed that it would take B.G. at least five more months to complete the program if he bought into the program and was being consistent with his behaviors, which he had not been doing up to that point. B.G.'s case manager also acknowledged that Gibault cannot force children to comply with its program and cannot confine them because it is a treatment-only facility. Even if we assume that the juvenile court ignored this testimony, the fact is that

it does nothing to undercut the juvenile court's disposition. There is no indication that the juvenile court failed to properly consider the evidence presented at the review hearing.

[14] B.G. also argues that placement in DOC is punitive. B.G., however, does not present evidence to support this assertion, and our review of the record has uncovered none. B.G.'s probation officer informed the juvenile court that DOC could provide the structure that B.G. needs and also provide him with an education, counseling, group and individual therapy, and a diagnostic intake within the first two weeks to determine what his educational, psychiatric, and mental health needs are and how best to address his issues. The juvenile court informed B.G. that he would have an intake assessment to determine what facility would be most appropriate for his needs and he would be provided with educational services, counseling services, and other "services that are aimed at making sure [he] stay[s] out of trouble" Tr. Vol. II p. 46. This record demonstrates that B.G.'s placement in DOC is to provide a placement that better fits his educational, emotional, and mental health needs rather than to punish him for bad behavior. In the end, B.G.'s arguments are nothing more than an invitation to reweigh the evidence, which we will not do. *See J.S. v. State*, 110 N.E.3d 1173, 1175 (Ind. Ct. App. 2018), *trans. denied*.

[15] We affirm the judgment of the juvenile court.


Najam, J., and Mathias, J., concur.