## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 18 2020, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| **P.M.,** | February 18, 2020 |
| *Appellant-Respondent,* | Court of Appeals Case No. 19A-JV-2365 |
| *v.* | Appeal from the Decatur Circuit Court |
| **State of Indiana,** | The Hon. Timothy B. Day, Judge |
| *Appellee-Petitioner.* | Trial Court Cause Nos. 16C01-1907-JD-244 16C01-1907-JD-243 16C01-1902-JD-53 |

**Bradford, Chief Judge.**

# Case Summary

[1] For actions taken in January, May, and July of 2019, the State alleged in three separate cause numbers that P.M. committed what would be Level 6 felony theft of a firearm, Level 6 felony obstruction of justice, Level 6 felony residential entry, Class A misdemeanor carrying a handgun without a license, Class A misdemeanor resisting law enforcement, two counts of Class A misdemeanor theft, Class B misdemeanor unauthorized entry of a motor vehicle, and Class C misdemeanor possession of paraphernalia if committed by an adult. P.M. eventually admitted to committing theft in cause number 16C01-1907-JD-244 ("Cause No. 244"), theft in cause number 16C01-1907-JD-244 ("Cause No. 243"), and, in cause number 16C01-1902-JD-53 ("Cause No. 53"), theft of a firearm, carrying a handgun without a license, resisting law enforcement, and unauthorized entry of a motor vehicle. Noting the many failures of less-restrictive placements to cause P.M. to reform himself, the juvenile court ordered P.M. committed to the Indiana Department of Correction ("the DOC") for an indeterminate term. P.M. contends that the juvenile court abused its discretion in ordering him committed to the DOC. Because we disagree, we affirm.

# Facts and Procedural History

[2] P.M. was born on April 10, 2002, and began having problems at an early age. Beginning in 2008, P.M. has received counseling from Centerstone after he was diagnosed with ADHD, anxiety disorder, oppositional defiant disorder, and parent–child relational problem. In 2009, P.M. started a fire in his

grandmother's house, nearly destroying it. In September of 2009, P.M. was expelled from a summer youth program and a vacation Bible school due to verbal and physical aggression and admitted for inpatient treatment for behavioral difficulties. In November of 2011, P.M. took a mobile telephone to school that contained pornographic images, which he showed to other students. Between November 2 and 7, 2011, P.M. was placed at Whitewater Valley Care Pavilion after expressing suicidal and homicidal ideation.

[3] More recently, and prior to the events at issue in this appeal, P.M. was found delinquent for committing battery resulting in bodily injury, criminal trespass, escape, and conversion and for leaving home without permission. P.M. has been placed on probation several times and has violated the terms of probation by committing such acts as unauthorized entry to a motor vehicle, leaving home without permission, illegal consumption of an alcoholic beverage, multiple drug screens that were positive for marijuana, and truancy. At least once previously, P.M. was placed on home detention but was terminated from the program after he cut a monitoring device from his ankle. The resulting escape charge, as well as other probation violations, led to P.M.'s commitment to the DOC in April 2017. After his release, P.M. was returned to the DOC for violating parole in March of 2018. P.M. was released again from the DOC in May of 2018 and remained on parole until November of that year.

# I. Cause No. 53

[4] On January 16, 2019, Decatur Sheriff's Deputy Eric Blodgett was dispatched to investigate a call regarding a suspicious juvenile male who was reported to be

breaking into vehicles in the Hillcrest neighborhood of Greensburg. At 2:21 a.m., Deputy Blodgett saw a male subject matching the description he was provided, pulled his vehicle over, and turned off his headlights. Shortly thereafter, Deputy Blodgett observed the juvenile, who turned out to be P.M., walking in-between houses and near several vehicles. Deputy Blodgett approached P.M. with his emergency lights activated. After seeing Deputy Blodgett approaching, P.M. turned and started to walk away. The uniformed Deputy Blodgett pulled up alongside P.M. and ordered him to stop, but P.M. refused, asked "what the f[***] for?", and ran behind a nearby house. Ex. Vol. p. 9. After a brief pursuit, Deputy Blodgett tackled P.M. to the ground and restrained his hands. P.M. was taken into custody and a handgun was recovered from his person.

[5] During an interview with authorities, P.M. admitted that he had been in possession of the handgun, which he knew to be loaded, and also admitted that he had stolen the handgun from a vehicle parked near a school building several days earlier and his intent was to sell the weapon. On February 14, 2019, the State filed a delinquency petition in which it alleged that P.M. had committed what would be Level 6 felony theft of a firearm, Level 6 felony obstruction of justice, Class A misdemeanor carrying a handgun without a license, Class A misdemeanor resisting law enforcement, and Class B misdemeanor unauthorized entry of a motor vehicle if committed by an adult.

## II. Cause No. 243

On May 17, 2019, P.M. and another juvenile were in the Greensburg Walmart store when asset protection personnel observed them put bottles of liquor into their backpacks. After P.M. and his companion walked past the last point of purchase, asset-protection personnel approached them, and police were dispatched to the scene. On July 16, 2019, the State filed a delinquency petition in which it alleged that P.M. had committed what would be Class A misdemeanor theft if committed by an adult.

## III. Cause No. 244

Early in the morning on July 7, 2019, P.M. was a passenger in a vehicle that was stopped by Greensburg Police Officer Derek Fasnacht. When Officer Fasnacht approached the car, he detected the odor of marijuana emanating from inside the vehicle, and he subsequently ordered the occupants, including P.M., to exit the car. A search of the interior of the Buick revealed the presence of a marijuana grinder with plant residue on it. Also in the backseat, near where P.M. had been sitting, Officer Fasnacht found a pair of Air Jordan basketball shoes, a PlayStation 4 video gaming console, a purple and teal PlayStation 4 controller, and a gray plastic garbage bag that contained another PlayStation 4 console, multiple PlayStation 4 video games, and virtual-reality equipment.

Later that morning, Officer Fasnacht received a report from Jesse McClinic, who claimed that several items had been stolen from his home overnight. Officer Fasnacht was dispatched to McClinic's residence, where McClinic

informed him that he was missing two PlayStation 4 consoles, multiple video games, movies, and pieces of virtual-reality equipment. McClinic informed Officer Fasnacht that there were no signs of forced entry at the residence, and he indicated that the only other individuals who had a key to the home were his mother and his former roommate, Trent Ruble.

[9] The next day, after learning that a person matching P.M.'s description had attempted to sell a PlayStation 4 with no serial number, police travelled to P.M.'s home and spoke to him. During the interview, P.M. produced a PlayStation 4 console, several games, and a controller from his backpack, claiming that he had received them from a friend. Later that same day, P.M. and his mother ("Mother") were called to the Greensburg Police Department where, after being advised of their *Miranda* rights, they consented to an interview. P.M. eventually acknowledged that Trent Ruble had let him into McClinic's residence. On July 17, 2019, the State filed a delinquency petition in which it alleged that P.M. had committed what would be Level 6 felony residential entry, Class A misdemeanor theft, and Class C misdemeanor possession of paraphernalia if committed by an adult.

## IV. Common Procedural History

[10] The juvenile court held an initial hearing in Cause Nos. 53, 243, and 244 on July 23, 2019, and P.M. admitted to committing theft in Cause No. 244, theft in Cause No. 243, and, in Cause No. 53, theft of a firearm, carrying a handgun without a license, resisting law enforcement, and unauthorized entry of a motor vehicle. The juvenile court ordered P.M. to undergo a pre-dispositional

diagnostic evaluation with the DOC and further ordered P.M. detained until his dispositional hearing. From August 7 to August 27, 2019, P.M.'s diagnostic evaluation was conducted at the Logansport Juvenile Detention Facility.

[11] During P.M.'s evaluation with psychiatric social service specialist Mary Ingram, P.M. disclosed the use of multiple illegal substances, including daily use of marijuana since the age of eight or nine, weekly use of prescription pills since the age of thirteen, and ecstasy use every other day. Ingram noted that P.M. expressed frustration with his lengthy history of residential placements and admitted that his relationship with Mother was poor. P.M. informed Ingram that his father ("Father") was willing to allow P.M. to reside with him, and Ingram recommended that the juvenile court attempt a placement with Father if he is willing, as well as strict court supervision to ensure that P.M. would be successful with community-based services. Ingram also stated, however, that if P.M. "fail[ed] to cooperate with the stipulations of his probation, placement in a structured residential treatment setting is recommended." Ex. 1 p. 26.

[12] Dr. Ellen Keris, Ph.D., performed a psychological examination, which included a battery of assessments, the results of which led Dr. Keris to diagnose P.M. with childhood-onset conduct disorder and polysubstance abuse. Through her observations, Dr. Keris also disputed several previous diagnoses that P.M. had received from other service providers over the years, including diagnoses of autism spectrum disorder, ADHD, and certain thought disorders. Dr. Keris concluded that P.M.'s conduct-disorder diagnosis is "[h]ighly [l]ikely to develop

into Antisocial Personality Disorder once he turns 18." Ex. Vol. p. 33. Dr. Keris determined that treatment of P.M. would likely be "difficult" based on her observations due to P.M.'s desire to manipulate treatment providers, and she found that P.M. appears to have "functioned the best while in the DOC[.]" Ex. Vol. p. 34.

[13] The final of P.M.'s three evaluators was Dr. Shivani Sharma, M.D., who performed a substance-abuse and mental-status examination on P.M. Dr. Sharma concluded that P.M. appeared to be "at risk for violent behavior, oppositional behavior, and aggression." Ex. Vol. p. 64. Dr. Sharma also expressed concern that if P.M. could remain with family members, he "may continue to run away in times of conflict." Ex. Vol. p. 64. These findings led Dr. Sharma to recommend that P.M. be placed in a "temporary group home/residential" until his relationship with family could be stabilized. Ex. Vol. p. 64.

[14] From July 23 to August 6, 2019 (prior to P.M.'s diagnostic evaluation), and from August 23 to September 11, 2019 (immediately following his diagnostic evaluation), P.M. was housed in the Johnson County Juvenile Detention Center ("the JCJDC"). In the approximately one month that P.M. was in the JCJDC, thirteen incident reports were filed against him for behavioral problems, including spitting on staff members and student detainees, punching the wall, kicking his room door and windows, cursing at staff members and other student detainees, disrupting the educational environment, threatening female student detainees, willfully obscuring the monitoring camera in his

room, and shattering a plastic cup and retaining shards of the cup hidden in his room. P.M.'s behavior was so erratic that he was removed from the facility's general population. Facility staff attempted multiple interventions to improve P.M.'s behavior, but these were largely unsuccessful. For example, P.M. would cover the camera in his room to prevent facility staff from monitoring him. Additionally, P.M.'s behavior prevented him from being offered school time at the facility, and he also frequently refused personal-hygiene time.

[15] The juvenile court held a dispositional hearing in P.M.'s cases on September 11, 2019. At the hearing, P.M. testified and requested that the juvenile court place him on home detention with Father. Father also testified, and he too requested that P.M. be placed on home detention under his supervision. Father explained that he had developed a safety plan for P.M. Under his proposal, Father planned for P.M. to work with him in Cincinnati, Ohio, for a maximum of nine hours per day, at least five days a week. During the remaining time, P.M. would be alone and unsupervised inside a room at Father's workplace while Father finished out the workday. According to Father, P.M. would also be expected to complete educational tasks once he and Father arrived home at night, usually between the hours of 8:00 and 11:00 p.m.

[16] When Mother took the stand, she testified that P.M. would not be allowed to reside in her home upon his release from State custody. Mother described her relationship with P.M. as "toxic" and further stated that P.M. was "very disrespectful, and rude, and arrogant; [and] treats females horribly." Tr. Vol. II p. 119. Mother stated that she believed that P.M. posed a safety risk for her

other children at home due to his violent behavior and the fact that he continuously brought drugs into the home.

[17] The juvenile court rejected P.M.'s request to be placed on home detention with Father. Specifically, the juvenile court took issue with arguments raised by P.M. claiming that he had never been treated for an autism diagnosis. After reviewing P.M.'s history of delinquency adjudications, the juvenile court concluded that the most suitable placement for P.M. was a commitment to the DOC:

> I have not let this child down. I have not institutionalized this child. I have done everything I can do since I've been a judge, to try to help this child.
>
> Ms. Schilling looked up for me this week, how much money has been spent to try to help this child. Can you believe over $300,000 has been spent to try to help this child? So, don't give me that crap of you're not doing enough for him, we've done plenty for him. We have done every gamut of service that I can think of. He's had homebound services. He's been in residential treatment. He's been with the Department of Corrections of Johnson County. He's been on home detention. He's failed them all.

Tr. Vol. II pp. 127. In its dispositional order, the juvenile court took judicial notice of the other cases in which P.M. had previously been ordered into "services, placement, and wardships[,]" namely, cause numbers 16C01-1506-JD-172, 16C01-1410-JD-318, 16C01-1408-JD-221, 16C01-1305-JM-77, 16C01-1202-JC-37, 16C01-0911-JC-310, and 16C01-0904-JM-109. Appellant's App. Vol. II p. 94. The juvenile court granted wardship over P.M.to the DOC for an indeterminate term.

# Discussion and Decision

[18] P.M. contends that the juvenile court abused its discretion in ordering him committed to the DOC for an indeterminate time. A juvenile court is accorded "wide latitude" and "great flexibility" in its dealings with juveniles. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). "[T]he choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion." *Id.* The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition. *Id.* An abuse of discretion occurs when the juvenile court's action is "clearly erroneous" and against the logic and effect of the facts and circumstances before it. *Id.*

[19] The goal of the juvenile process is rehabilitation rather than punishment. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). "Accordingly, juvenile courts have a variety of placement options for juveniles with delinquency problems, none of which are considered sentences." *Id.* Indiana Code section 31-37-18-6(1)(A) provides that "[i]f consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that is in the least restrictive (most family like) and most appropriate setting available." "[T]he statute contains language that reveals that a more restrictive placement might be appropriate under certain circumstances." *J.S.*, 881 N.E.2d at 29. The law requires only that the disposition selected be the

least restrictive disposition that is "consistent with the safety of the community and the best interest of the child." *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005).

[20] Here, neither P.M.'s interests nor those of his community are best served by a placement outside of the DOC. P.M.'s history indicates that his many placements, both in an out of the DOC, have failed to reform him. Prior to the delinquency adjudications at issue in this appeal, P.M. was found delinquent for committing battery resulting in bodily injury, criminal trespass, escape, conversion, and leaving home without permission. P.M. has been placed on probation several times and has violated the terms of probation several times. At least once previously, P.M. was placed on home detention but was terminated from the program after cutting his monitoring device from his ankle. The resulting escape charge, as well as other violations of the terms of probation, led to P.M.'s commitment to the DOC in April 2017. After his release, P.M. was returned to the DOC for violating parole in March of 2018. P.M. was again released in May 2018 and remained on parole until November of that year, only to commit the theft-related offenses in Cause No. 53 three months later.

[21] Moreover, P.M. has a long history of violent behavior that includes multiple batteries involving Mother, Mother's boyfriend, his grandmother, and another juvenile placed at the Youth Opportunity Center with P.M. In 2011, P.M. expressed "homicidal ideation" toward the son of Mother's boyfriend. Ex. Vol. p. 30. On one occasion during his previous commitment to the DOC, P.M.

disclosed to medical staff that he had been "waiting all day to cut somebody up." Ex. 1 p. 31. Not only has P.M.'s behavior not improved over time, it has worsened: during P.M.'s detention pending disposition in this cases at issue in this appeal, he accrued thirteen disciplinary reports while housed in the JCJDC, one of which was for spitting on female residents while another involved an incident where he struck a staff member.

[22] It is undisputed that P.M. suffers from several mental-health and behavioral disorders that are, to varying degrees, related to his delinquent acts. Past services, however, have not been effective. As Dr. Keris opined, P.M. is generally "quite resistant to treatment" for these illnesses. Ex. 1 p. 33. Past services ordered for P.M. include counseling, home-based services, and inpatient residential treatment programs, none of which have taken. P.M. refused outright to participate in home-based treatment sessions and out-of-home therapy when ordered into services in the past. Most recently, P.M. was ordered into a residential placement at Fayette Regional Care in 2018, which ended in P.M.'s unsuccessful termination from the program after he was observed making gang signs to his peers and found in possession of tobacco products in his room. According to Dr. Keris, P.M.'s "reported mental health symptoms appear [] to almost be a source of pride and validation for poor behaviors and while he endorsed several problems, behavioral observations contradicted them all." Ex. 1 p. 31. In summary, P.M.'s history is one of worsening behavior and failure of all previous attempts to address it. We see little in the record to suggest that a less-restrictive placement will work this time.

[23]     P.M. points to Rebecca Kime's testimony to support his argument that the juvenile court should have ordered a placement less restrictive than the DOC. Kime testified that placement in Father's home was in P.M.'s best interests because it would permit him to receive treatment for autism spectrum disorder, for which P.M. had never before been treated through court-ordered services. Kime never testified, however, that there was any kind of causal nexus linking P.M.'s delinquent behavior to his autism diagnosis, and P.M.'s autism diagnosis was rejected by Dr. Keris during P.M.'s diagnostic evaluation in any event. The juvenile court was under no obligation to credit Kime's testimony and did not. P.M.'s argument is an invitation to reweigh the evidence, which we will not do. *See J.S. v. State*, 110 N.E.3d 1173, 1175 (Ind. Ct. App. 2018), *trans. denied*.

[24]     P.M. also relies on two cases, *R.A. v. State*, 936 N.E.2d 1289 (Ind. Ct. App. 2010), and *E.H. v. State*, 764 N.E.2d 681 (Ind. Ct. App. 2002), *trans. denied*, in which we overturned juvenile court dispositions for juveniles with serious mental illnesses. While P.M. is correct that both he and the respondent in *R.A.* have histories that include diagnosed psychological illnesses, the two cases are otherwise easily distinguished. In *R.A.*, we reversed the juvenile court's decision to commit the respondent to the DOC because the respondent, unlike P.M., had "no prior contact with the juvenile justice system" and because multiple mental-health experts testified—with the State's agreement—that placement in a residential facility was in the best interests of both the child and the community. *R.A.*, 936 N.E.2d at 1291. As mentioned, P.M. has had many

unsuccessful contacts with the juvenile justice system, and there is certainly no consensus that he is suffering from serious mental illness or that residential placement is in his, or the community's, best interests.

[25] In *E.H.*, 764 N.E.2d at 686, we reversed a juvenile's commitment to the DOC after concluding that the record established that the juvenile had made "considerable progress" while undergoing treatment in a less-restrictive placement and that his lack of a history of violence meant that he presented no threat to the community. *E.H.*, like *R.A.*, is easily distinguished. In contrast to the juvenile in *E.H.*, P.M. has no history of success in less-restrictive placements, and the escalating seriousness of his criminal behavior supports a conclusion that he does, in fact, pose a threat to the community. P.M.'s reliance on *R.A.* and *E.H.* is unavailing.

[26] Finally, P.M. argues that he should have been placed with Father. As the juvenile court concluded, however, Father is an inappropriate placement for P.M. due to his undisputed criminal history, history of family violence, and historical lack of involvement with P.M. Father himself acknowledged during the dispositional hearing that he had essentially "abandoned" P.M. Tr. Vol. II p. 65. Moreover, Father's safety plan for P.M. would have required P.M. to be away from home for between twelve and sixteen hours each day with lengthy periods of time spent without adult supervision. The safety plan would permit P.M. to work with Father for a maximum of nine hours per day, with the remaining time being spent alone and unsupervised in a room at Father's place of employment while Father continued to work. In sum, P.M. is asking to be

placed with a father who has never parented him before and for us to endorse a safety plan that fails to provide the structure and supervision necessary to ensure that he receives the educational and rehabilitative services that he requires. P.M. has not established that a placement with Father would be in either his or the community's best interests.

[27] The juvenile court's decision to order P.M. committed to the DOC was not an abuse of its broad statutory discretion. The record supports a conclusion that P.M. is likely to benefit most from a highly restrictive placement in the DOC, as it is the only placement that both ensures P.M. has access to treatment while preventing him from committing new delinquent acts. We conclude that the juvenile court's decision was not contrary to the facts and circumstances before it.

[28] We affirm the judgment of the juvenile court.

Robb, J., and Altice, J., concur.