## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Oct 19 2020, 8:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.J., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner,* | October 19, 2020 <br><br> Court of Appeals Case No. 19A-JV-3029 <br><br> Appeal from the Brown Circuit Court <br><br> The Honorable Mary Wertz, Judge <br><br> Trial Court Cause No. 07C01-1710-JD-153 |

**Robb, Judge.**

# Case Summary and Issue

[1] D.J. was adjudicated a delinquent child in 2018 for acts that would have been resisting law enforcement and disorderly conduct if committed by an adult. He was placed on formal probation for six months. In the ensuing months, D.J. continued to commit delinquent acts that resulted in the juvenile court modifying its dispositional order multiple times to extend D.J.'s probation and order his placement in a variety of facilities. In November 2019, after D.J. admitted to committing additional delinquent acts, the juvenile court modified its dispositional order to award wardship of D.J. to the Indiana Department of Correction ("DOC"). D.J. appeals this modification, raising one issue for our review: whether the juvenile court abused its discretion in awarding wardship to the DOC when a less restrictive alternative was available. Concluding the juvenile court did not abuse its discretion in committing D.J. to the DOC because no less restrictive placement was consistent with his best interests and the safety of the community, we affirm.

# Facts and Procedural History

[2] In late October 2017, thirteen-year-old D.J. was detained when he got mad and ran from school, created a disruption in a nearby doctor's office, and was combative with police when they came to calm him down. At the time, D.J. had already been on an informal adjustment, his family had an open case with the Department of Child Services, and he had been diagnosed with bipolar and oppositional defiance disorders, for which he was receiving services. D.J. was

released from detention to the custody of his mother pending admission to an acute care facility. After completing his stay at the facility, he returned to the home of his mother and continued to receive services. In December, a petition was filed alleging D.J. was a delinquent child for committing acts that, if committed by an adult, would be resisting law enforcement, a Class A misdemeanor, and disorderly conduct, a Class B misdemeanor. In January 2018, D.J. admitted to having committed the delinquent acts and was placed on formal probation for six months. Terms of his probation included that he "[c]ommit no acts of physical aggression or damage any property." Appellant's Appendix, Volume 2 at 45.

[3] In April, the probation department filed a petition seeking modification of the dispositional order alleging that D.J. had committed disorderly conduct and criminal mischief, both Class A misdemeanors if committed by an adult, when he behaved aggressively and caused property damage at school. D.J. admitted the allegations in the petition to modify and the juvenile court modified the dispositional order to continue D.J.'s probation until further order of the court and place him at Gibault Children's Services ("Gibault") in their residential CARE program. A review report filed in July 2018 by the probation department stated that D.J.'s transition to residential treatment in the CARE program had been "quite difficult": from May 4 to July 8 he had eighty-four incidents of non-compliance, including run away attempts, aggression toward others, leaving assigned areas, verbal aggression, peer agitation, and property destruction and had caused two significant injuries to himself because of his

"out of control behaviors[.]" *Id.* at 87. Nonetheless, the treatment team felt he was making progress and that a recent change of attitude might lead him to focus on his treatment and address his behaviors. At a periodic review hearing on July 17, 2018, the juvenile court continued D.J.'s placement in the CARE program.

[4] On August 23, 2018, the probation department filed a request for an emergency change of placement to a secure program at Gibault because D.J. had swallowed two harmful objects "so he could die." *Id.* at 90. The juvenile court granted the request and ordered the change of placement. In October, while in the secure program, D.J. was transported to a doctor's appointment where he became upset. On the return trip, he kicked the window out of the van and fled, nearly being hit by a car as he ran across a road. The probation department filed a petition seeking to modify the dispositional order alleging D.J. had committed acts that would be criminal mischief, a Class B misdemeanor, and escape, a Level 6 felony, if committed by an adult. D.J. was placed in secure custody at Dickinson Juvenile Justice Center ("Dickinson") pending a hearing because Gibault was unwilling to let him continue in their program. D.J. subsequently admitted the allegations and the juvenile court continued his probation until further order of the court and ordered him returned to Dickinson pending acceptance and placement at Wernle Youth and Family Treatment Center ("Wernle"). D.J. was placed at Wernle on November 6, 2018. While at Wernle, D.J. had a psychological diagnostic evaluation and was diagnosed with disruptive mood dysregulation disorder,

conduct disorder, and bipolar one disorder. *See* Transcript, Volume II at 120-21. At the time of a review hearing in May 2019, D.J. remained at Wernle, where he was "meeting the expectations of the program and it is expected that he will be recommended to discharge before the beginning of school in August, 2019" at which time he would return to his mother's home and continue on probation. Appellant's App., Vol. 2 at 146.

[5] In early July, however, D.J. exhibited "out of control, aggressive behaviors" at Wernle and was taken first for a mental health assessment and then placed at Harsha Behavioral Center for a few days. *Id.* at 151. When D.J. was released back to Wernle staff, he threatened an officer and ran away. On July 15, 2019, the probation department filed a petition to modify the dispositional order alleging D.J. had violated his probation by committing what would be intimidation, a Class A misdemeanor if committed by an adult, as well as "eloping from staff, displaying aggressive, unsafe behaviors at Wernle that resulted in an acute care placement, fail[ing] to comply with his individual treatment plan . . ., and refusing to return to Wernle[.]" *Id*. at 152. At that time, Wernle was willing to accept D.J. back into its secure private unit. After D.J. returned to Wernle, however, his behavior escalated to the point that he stopped communicating with his mother, he committed additional delinquent acts such that the probation department filed two more petitions to modify the dispositional order, and in September, Wernle indicated it was no longer willing to house D.J. and requested his immediate removal from the program.

D.J. was returned to secure detention at Dickinson pending the outcome of the petitions to modify.

[6] On October 8, 2019, D.J. admitted to the allegations of the pending petitions to modify, including that he had violated his probation by committing acts that would be criminal mischief and two counts of disorderly conduct if committed by an adult. D.J.'s probation officer indicated she was having trouble finding a placement for him; she testified that the probation consultant had advised her to apply to Midwest Academy and DePaul Academy and "if he was denied admission to both of those facilities, that there would be no other agency in Indiana that would accept him." Tr., Vol. II at 190. And indeed, he had been denied admission by both facilities because of his history of aggressive, out of control, and self-injurious behaviors. She was pursuing a state mental health admission at the Indiana Neurodiagnostic Institute as "frankly, . . . the only thing I have found available for [D.J.] at this time. Other than a DOC commitment and I would prefer not to go there." *Id.* at 189.

[7] On November 27, 2019, the juvenile court held a dispositional hearing. Jennifer Acton, the county's chief probation officer,[1] informed the court that D.J. had been denied admission into the state hospital. He had been accepted at a residential facility in Schererville called Compagna Academy, but she was

---

[1] Brenda Dewees, D.J.'s regular probation officer, was unable to attend the dispositional hearing and Ms. Acton attended in her place, attesting that she had been "firmly apprised of all the nature and circumstances of . . . this action[.]" Tr., Vol. II at 198.

concerned that "it is very similar to Wernle. A program he's been at before. [A]nd the security there was . . . not . . . sufficient to provide him the safety he needs." *Id.* at 199. She was also concerned because the facility was near Chicago which would make it difficult for his mother to participate in family counseling and regular visitation and which would also pose a danger if he were to escape. Dickinson would not accept D.J. back into secure detention because he had battered several staff members, returning him to his family was not appropriate because of his behavioral issues, and no other suitable placement was willing to take him. Thus, Acton felt there were no options other than placement at DOC because "we've tried to give it some time but his . . . behaviors have continued, they've increased, they've gotten more severe. . . . [B]ut there is programming at [DOC], the Division of Youth Services." *Id.* at 200.

[8]     D.J.'s attorney asked what the downside of trying Compagna was, given that DOC would remain an option if he did not succeed there, and Acton answered that the downside was "he's left these types of facilities before and the behaviors are continuing[;] that makes him a danger to himself, . . . other students and staff." *Id.* at 202-03. She had not personally visited Compagna but spoke with the Chief Probation Officer in Lake County, a probation officer who handles the juveniles sent to that facility, and the local Department of Child Services consultant. The answers she got from each of those people led her to believe that "DOC is better prepared to handle [D.J.] and . . . it's a more secure facility

and he won't be able to escape. And . . . they'll have a better ability to handle his behaviors." *Id.* at 203.

[9] D.J. testified that he would rather go to Compagna and that he understood that if he messed up there, there would be no other option than for him to go to DOC. Knowing that, he believed he would finally be able to control his behavior and his emotions and stop lashing out. He asked for "one last chance. That's all it takes, all it takes [is] one last chance." *Id.* at 232.

[10] At the conclusion of the evidence, the juvenile court stated:

> I'm truly sadden[ed] that we are here today considering
> Department of Corrections for you. It's . . . a series of events that
> I don't think anyone anticipated throughout these proceedings
> until the last few months. . . . [T]his all started with your
> resisting authority and it has continued to be the . . . beginning
> and the end of everything that the Court's tried to do and
> Probation has tried to do and treatment facilities have tried to do,
> is that you just cannot . . . control yourself. And I think that had
> your time in Dickenson [sic] not been so very violent . . . to the
> point that a detention facility is telling the Court that they can't
> take you back. That's . . . just so significant. . . . I don't have
> any faith that if you go to Compagna that you will be able to
> control yourself. . . . Any more than you've not been able to do
> so at Wernle and at secure detention. . . . I don't think DOC is a
> good option, but I don't know that I have any other option[.]
>
> * * *
>
> I wished that the mental health commitment at State
> Hospitalization would have worked. But it didn't. And after
> considering all the evidence and the record of the proceeding and

the psychological evaluation, I am awarding wardship to the Department of Corrections for housing. . . . And the reason is that . . . your conduct since after that May review hearing has really left the Court with no other realistic option.

*Id.* at 229-31. The court's written order stated that "[a]fter careful consideration, the Court finds that a commitment to the Indiana Department of Corrections is necessary and that no less restrictive alternative exists." Appealed Order at 3. D.J. now appeals this disposition.

# Discussion and Decision

D.J. asserts that the juvenile court abused its discretion in modifying his placement "because of the low level of offenses and the poor investigation to alternatives to DOC placement." Appellant's Brief at 11. The disposition of a juvenile adjudicated a delinquent is a matter committed to the juvenile court's discretion, subject to the statutory considerations of the child's welfare, community safety, and the policy favoring the least harsh disposition. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). Those statutory considerations are found in Indiana Code section 31-34-19-6, which provides:

If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:

(1) is:

> (A) in the least restrictive (most family like) and most appropriate setting available; and

> (B) close to the parents' home, consistent with the best interest and special needs of the child;

> (2) least interferes with family autonomy;

> (3) is least disruptive of family life;

> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

A juvenile court has wide latitude and great flexibility in dealing with juveniles; however, its goal is to rehabilitate rather than punish. *C.T.S. v. State*, 781 N.E.2d 1193, 1203 (Ind. Ct. App. 2003), *trans. denied*. We review the juvenile court's disposition and modification orders for an abuse of discretion, which occurs if its decision is clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences that may be drawn therefrom. *R.H.*, 937 N.E.2d at 388.

[12] D.J. argues his commitment to DOC was an abuse of discretion because a less restrictive alternative was available; namely, placement at Compagna. However, even if less harsh options are available to the juvenile court, there are still times when commitment to a suitable institution is in the best interest of the

juvenile and of society. *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005). Indiana Code section 31-34-19-6 requires the juvenile court to consider the least restrictive placement only *if* that placement comports with the safety needs of the community and the child's best interests. *See J.B. v. State*, 849 N.E.2d 714, 718-19 (Ind. Ct. App. 2006) (concluding the juvenile's placement in DOC was warranted because the less-restrictive placement suggested by him would have fallen short of meeting the community's safety needs and his best interests given testimony he was a danger to himself and others until he receives substance abuse treatment and learns to modify his criminal behavior).

[13]  Here, the juvenile court specifically stated that placement in a juvenile correctional facility through the DOC was warranted because of D.J.'s "violent conduct and history of escape[.]" Appealed Order at 2. The court noted that "extensive efforts" had been made to provide D.J. with care, treatment, and rehabilitation, including "supervised probation, Wrap Around Services, secure detention, placement at Gibault in the CARE Program and then the [secure] Program . . ., placement at Wernle [ ], a mental health assessment . . . followed by placement [at] Harsha Behavioral Center, and then followed by a return to Wernle." *Id.* at 1. Despite these many attempts to help D.J. correct his behavior, he failed to engage well in services—lashing out violently against staff, destroying property, and absconding when he saw an opportunity. He was ultimately removed from Wernle for aggressive, destructive, and self-injurious behaviors that were escalating in severity. Dickinson, his most recent

placement, would not accept him back into secure detention following the dispositional hearing for similar reasons.

[14] Despite D.J.'s "low level of offenses[,]" Appellant's Br. at 7, the juvenile court considered the danger he posed to the safety of the community in general, mentioning D.J.'s violent behavior toward service providers while in various placements. The juvenile court noted that D.J. is resistant to authority and that "these people that go to work [in these facilities] don't deserve to get hit and [have] things thrown at them." Tr., Vol. II at 229. Further, the fact that D.J.'s behavior had not been curbed despite the many services offered to him showed that such services, including a placement that was nearly identical to Compagna, were no longer in D.J.'s best interests because they were not beneficial. Additional investigation into Compagna was unnecessary where it was clear that no facility short of DOC was secure enough to control D.J.'s "aggressive and violent" behaviors and history of escape. Appealed Order at 2. We also note that the juvenile court acknowledged D.J.'s mental health issues. Unfortunately, he was denied placement in a mental health institute, but the juvenile court recommended that DOC consider those issues in its plan for D.J.'s care, treatment, and rehabilitation.

[15] At only fifteen years old, D.J. has already had many contacts with the juvenile court, repeatedly violating the terms of his probation and absconding from various placements. His behavior has escalated rather than being successfully addressed. Although D.J. contends that Compagna would be the least restrictive placement and that the juvenile court should have ordered him

placed there, he has not shown that there is a reasonable probability that the program would benefit him any more than other, similar programs have. And his own behavior precludes any other options from being willing to work with him. We therefore conclude that it was reasonable for the juvenile court to find that the many less restrictive services and opportunities offered to D.J. had not been successful and that he posed a danger to both himself and to the community. *Cf. E.H. v. State*, 764 N.E.2d 681, 686 (Ind. Ct. App. 2002) (concluding juvenile's commitment to DOC was in error where there was a less restrictive and appropriate alternative available, no evidence that juvenile was a threat to the community, and no explanation for commitment other than it "being the typical next step"), *trans. denied*. The juvenile court was within its discretion to conclude that commitment to a less restrictive environment than the DOC was not in D.J.'s best interests or consistent with the safety of the community.

# Conclusion

The juvenile court did not abuse its discretion when it modified its dispositional order and awarded wardship of D.J. to the DOC and its order is therefore affirmed.

Affirmed.

Crone, J., and Brown, J., concur.