

**FILED**

Aug 23 2023, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Q.H.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner*

August 23, 2023

Court of Appeals Case No.
23A-JV-326

Appeal from the St. Joseph Probate
Court

The Honorable Graham C.
Polando, Magistrate

Trial Court Cause No.
71J01-2211-JD-381

**Opinion by Judge Weissmann**
Judges Riley and Bradford concur.

**Weissmann, Judge.**

[1]     Thirteen-year-old Q.H. faced allegations that he was a juvenile delinquent for threatening staff and indirectly touching a teacher during an extended outburst at Q.H.'s alternative special education school. After being placed in a juvenile detention facility because his parents were unavailable to take custody of him, Q.H. admitted the delinquency allegations.

[2]     The juvenile court recognized that Q.H.'s misconduct was "relatively minor." Though this was Q.H.'s first contact with the juvenile justice system, the court nevertheless imposed the severest sanction by committing Q.H. to the Indiana Department of Correction (DOC). We reverse that judgment, finding that the juvenile court's judgment failed to adequately consider the special needs of this 13-year-old emotionally disabled, special education student new to the juvenile justice system.

## Facts

[3]     Q.H. was referred to an alternative special education school due to misbehavior. On his first day, Q.H. violated the cell phone policy and was removed from his classroom. Q.H. spent the next 90 minutes in the hallway pacing, arguing, yelling, throwing chairs, and tearing posters from the wall. He cursed at and threatened to kill a school staff member. Q.H. eventually picked up a metal filing tray and swung it at other school staff, including a school security officer. The officer eventually subdued Q.H. and transported him to St. Joseph County's juvenile detention center.

[4] At the time of the incident, Q.H.'s immediate family—consisting of his unemployed mother and several brothers—was homeless. Due to winter weather, a homeless shelter allowed the family to sleep at the facility at night, but they had to stay elsewhere during the day. Q.H.'s mother could not be located before the emergency detention hearing, which proceeded without either her or Q.H.'s father, who never participated in these proceedings.

[5] Although this was Q.H.'s first experience with the juvenile justice system, Q.H.'s counsel conceded that continued detention of Q.H. was merited because neither of Q.H.'s parents could take custody of him. The juvenile court, after finding probable cause to believe Q.H. committed the acts alleged in preliminary documents filed by the State, ordered Q.H. to remain at the juvenile detention center "to protect him and this community." Tr. Vol. II, p. 6.

[6] The State then petitioned to adjudicate Q.H. a delinquent. The petition alleged that Q.H. had engaged in misconduct which, if committed by an adult, would constitute Level 6 felony intimidation and Class B misdemeanor disorderly conduct, battery, and criminal recklessness. At Q.H.'s initial hearing on those allegations a week later, Q.H. admitted to committing acts of intimidation and battery. In exchange, the State agreed to dismiss the disorderly conduct and criminal recklessness allegations. The juvenile court accepted Q.H.'s admissions and scheduled a dispositional hearing. Q.H. remained in the juvenile detention center through the date of the dispositional hearing.

[7] While detained at the juvenile detention center, Q.H. misbehaved repeatedly, leading to 35 incident reports. These reports mostly revealed Q.H.'s threats to hurt himself and others, disrespectful behavior toward detention center staff, failure to follow directions, and clogging the toilet with his clothing. At times, his failure to comply with detention center staff's demands led to security officers restraining him while he resisted.

[8] At the dispositional hearing, the probation department recommended Q.H.'s commitment to the DOC because he had behaved so poorly in secure detention. The juvenile court agreed, entering these findings:

> The Court has investigated or has made provisions for the delivery of the most appropriate services from those available to prevent the child's placement out of the child's home or to reunify the child and family.
>
> Said child is in need of supervision, care, treatment and services which are NOT available in the local community.
>
> The child is in need of services beyond those which can be provided through probation services.
>
> There is no available person or facility in St. Joseph County Indiana which can provide the child with the necessary services.
>
> Said child should be removed from the home because continuation in the home would not be in the best interest of the child.
>
> The court finds reasonable efforts have been made to finalize a permanent plan for the child.
>
> The St. Joseph County Probation Department has the responsibility for placement and care of the child.

> This Dispositional Order is consistent with the safety and the best interest of the child and is the least restrictive and most appropriate setting available close to the parents' home, least interferes with the family's autonomy, is least disruptive of family life, imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

App. Vol. III, p. 119.

## Discussion and Decision

Q.H. argues that the juvenile court erred in committing him to the DOC. The disposition of a juvenile adjudicated a delinquent is a matter committed to the juvenile court's discretion, subject to the statutory considerations of the child's welfare, community safety, and the policy favoring the least harsh disposition. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). We review the juvenile court's disposition for an abuse of discretion, which occurs if its decision is clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences that may be drawn from them. *Id.* "In determining whether a juvenile court has abused its discretion, we neither reweigh evidence nor judge witness credibility." *J.S. v. State*, 110 N.E.3d 1173, 1175 (Ind. Ct. App. 2018).

We start with the premise that "[t]he nature of the juvenile process is rehabilitation and aid to the juvenile to direct his behavior so that he will not later become a criminal." *A.C. v. State*, 144 N.E.3d 810, 812 (Ind. Ct. App. 2020) (quoting *Jordan v. State*, 512 N.E.2d 407, 408 (Ind. 1987)). "For this

reason the statutory scheme of dealing with minors is vastly different than that directed to an adult who commits a crime." *Id.* Juvenile courts have a variety of placement options for children with delinquency problems. *Id.* But Indiana Code § 31-37-18-6 requires a court to consider these factors when entering a dispositional decree:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> > (1) is:
> >
> > > (A) in the least restrictive (most family like) and most appropriate setting available; and
> > >
> > > (B) close to the parents' home, consistent with the best interest and special needs of the child;
> >
> > (2) least interferes with family autonomy;
> >
> > (3) is least disruptive of family life;
> >
> > (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
> >
> > (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

## I. Q.H.'s Arguments

[11]    Q.H. argues that his commitment to the DOC was unduly harsh because this was his first exposure to the juvenile justice system and his misconduct was relatively minor. He also asserts that the dispositional order was improper because the record reflects no investigation of less restrictive options, including residential placement.

[12] We agree that the juvenile court's consideration of sanctions was inadequate for two reasons. First, the pre-dispositional report on which the juvenile court relied did not meet statutory requirements. It failed to evaluate placement options within the context of Q.H.'s needs, including his cognitive and psychological challenges documented in his educational and detention center records. Second, when considering the appropriate sanction, the juvenile court adopted that defective pre-dispositional report and did not broaden its inquiry to include consideration of Q.H.'s cognitive and psychological difficulties. As a result, the trial court's order committing Q.H. to the DOC did not incorporate the analysis required by Indiana Code § 31-37-18-6.

## A. Pre-dispositional Report Did Not Comply with Indiana Code § 31-37-17-6.1

[13] The pre-dispositional report prepared by a probation officer in a delinquency proceeding must contain "[a] description of all dispositional options considered in preparing the report." Ind. Code § 31-37-17-6.1(a)(1) (2022). The pre-dispositional report also must include "[a]n evaluation of each of the [dispositional] options considered in relation to the [recommended] plan of care, treatment, rehabilitation, or placement" for the child. Ind. Code § 31-37-17-6.1(a)(2) (2022).[1] The pre-dispositional report prepared in Q.H.'s case does not meet this second statutory requirement.

---

[1] Indiana Code § 31-37-17-6.1 was amended effective July 1, 2023, but continues to impose the same requirements found in subsections (a)(1) and (2) of the prior statute applicable here.

[14]   The report failed to evaluate dispositional options within the context of Q.H.'s needs, including his cognitive and psychological challenges. The report does not mention Q.H.'s cognitive challenges other than occasional references to his inability to understand the impact of his behavior. The only reference to Q.H.'s mental health is the report's statement that Q.H. has "[n]o mental health diagnoses at this time." App. Vol. III, p. 81. Yet, Q.H.'s cognitive difficulties were documented in mental health and behavior incident reports prepared by juvenile detention staff. Similarly, Q.H.'s school records reflected Q.H.'s psychological challenges.[2]

### i. Cognitive Difficulties

[15]   Q.H.'s cognitive difficulties were evident on his first day in the juvenile detention facility. For instance, Q.H. "had difficulty with reading and comprehending the screener" while completing a risk assessment when he first entered the juvenile detention facility. App. Vol. II, p. 47. Therefore, "in violation of standard administration procedures," the paperwork had to be read aloud to him by a detention officer. *Id.*

---

[2] The school and juvenile detention center records are included in Q.H.'s appendix but are not file marked or reflected on the CCS. The State cites some of those documents in its brief and has not sought to strike those portions of Q.H.'s appendix.

Appendices properly prepared under Indiana Appellate Rule 50 include only documents that are part of the Record on Appeal. App. R. 50(A)(2), (B)(1). The Record on Appeal consists of "the Clerk's Record and all proceedings before the trial court …." Ind. Appellate Rule 27. The Clerk's Record includes the CCS and "all papers, pleadings, documents, orders, judgments, and other materials filed in the trial court . . . or listed in the CCS." Ind. Appellate Rule 2(E). We therefore assume the school and juvenile center records were part of the trial court record and available to the probation department and juvenile court.

[16] The assessment identified Q.H. as having "coping problems." Q.H. was "very difficult to engage in conversation" and struggled with reading and writing, particularly his spelling. *Id.* at 48. After being screened for learning disabilities, he was referred for more testing. The record, however, contains no evidence of any further testing.

[17] Q.H. also scored in the "Caution" range for "Angry/Irritable." *Id.* The forensic clinician who evaluated him recommended a mental health assessment for Q.H. The psychologist who supervised mental health services at the juvenile detention facility recommended "no further follow-up" if Q.H. had been enrolled in special education.[3] The clinician later conducted a limited mental health assessment, but no psychological examination was ever conducted.

### ii. School Records

[18] Q.H.'s school records also suggest Q.H. has significant cognitive and emotional challenges. Before his detention, Q.H. was failing nearly all his special education classes. Though Q.H. was 13 years old, he could not add or subtract large numbers and lacked basic multiplication and division skills. One teacher

---

[3] Although the record does not reveal the psychologist's reasoning, he may have assumed that a psychological evaluation and learning disabilities testing were conducted as part of Q.H.'s special education enrollment. But even if that were the case, the record reflects no effort to gain access to or analyze any prior psychological evaluation or learning disabilities assessment in evaluating Q.H.'s needs and sanction.

questioned whether he lacked the cognitive ability to complete tasks even in special education classrooms.

[19] The school records also identify Q.H. as "a student with an emotional disability" who will not succeed in a classroom environment without strong support or with "too many supports." *Id.* at 126. The record does not reveal whether or how this "emotional disability" relates to the angry/irritable finding in Q.H.'s mental health assessment conducted in the juvenile detention center. Regardless, this "emotional disability" is not specifically identified in the record, presumably due to the lack of psychological testing of Q.H.

### iii. Q.H.'s Negative Behavior Related to his Cognitive and Emotional Struggles

[20] The pre-dispositional report's failure to evaluate dispositional options within the context of Q.H.'s needs was particularly problematic because the record repeatedly suggests a link between Q.H.'s negative behaviors and his apparent cognitive and emotional difficulties. For instance, two of Q.H.'s "Behavior Incident Reports" in detention arose from his failure to complete written essays. App. Vol. III, pp. 24, 26. During the first of these incidents, Q.H. reported that he could not complete the essay. During the second, he simply refused to write the essay. Although the record suggests Q.H.'s cognitive limitations may have left him unable to complete the essays, his refusal was treated as a willful violation of detention center rules.

[21] Moreover, Q.H.'s negative behaviors appeared to escalate when he was emotional. When Q.H. returned from a court hearing upset over his continuing

detention, Q.H. was combative and threatened to hurt himself or others if he were not released from detention. Refusing to lay down in his bed, Q.H. ultimately was placed in "mechanical restraints"—presumably, handcuffs— until he calmed down. *Id.* at 52. He was found crying in his room that day. Q.H. repeatedly apologized and reported that he was "going through a lot," given that he expected to go home that day, he was homesick, and his brother was ill. *Id.* at 57.

[22] Q.H. also reported having memory difficulties. *Id.* at 85. The forensic clinician concluded that Q.H.'s "behavioral difficulties [appear to] stem from poor memory retention and lack of coping skills." App. Vol. II, p. 91. She also reported that the escalation in Q.H.'s threats to others and of self-harm "appear[s] to be a result of frustration and poor coping skills, rather than genuine risk of harm." *Id.* at 85. She later reported that Q.H. struggled "to identify and articulate thoughts/feelings/emotions." *Id.* at 111. A juvenile detention officer also recognized that Q.H. "doesn't know why he gets angry." App. Vol. III, p. 31.

[23] The forensic clinician concluded that "[d]ue to [Q.H.'s] limited introspective skills, ongoing assessment and management will be heavily reliant on [his] externalizing behavior and stability." App. Vol. II, p. 111. In other words, Q.H. was judged at the juvenile detention facility largely by his behavior alone, although his behavior seemingly had been linked to his cognitive and emotional difficulties. Consistent with that behavior-focused approach, the pre-dispositional report recommended Q.H.'s commitment to DOC due to his poor

behavior without considering his need for treatment for cognitive or emotional impairments. The pre-dispositional report therefore violated the applicable version of Indiana Code § 31-37-17-6.1(a)(2).

## B. Lack of Investigation into Q.H.'s Needs Tainted Findings

[24] Adopting the findings in this defective pre-dispositional report, the juvenile court similarly focused exclusively on Q.H.'s behavior and ignored Q.H.'s cognitive and emotional needs. In its order committing Q.H. to the DOC, the court stated:

> [T]he Respondent is quite young, and . . . the offenses for which he has been adjudicated delinquent are relatively minor. However, his offenses are of a piece [sic] with the repeated, profoundly antisocial behavior he has displayed while detained, while at school, and while at home (the latter leading to his family's ejection from a housing facility). If even a secure environment has failed to protect the "community" within the detention facility, it stands to reason that a less secure environment, whether the home or a residential facility, would not provide further opportunity for disruptive and violent behavior. The Court therefore finds that any less restrictive placement is inconsistent with his safety and that of this community.

App. Vol. III, p. 98.[4]

---

[4] The record does not reveal "profoundly antisocial behavior" by Q.H. at the family's housing facility. The probation officer merely noted at the dispositional hearing that unspecified behavior by Q.H. at the homeless shelter led to their being "kicked out" before his detention. Tr. Vol. II, p. 28. Mother phrased their departure as being "timed out" without any mention of the cause. *Id.* at 20.

[25] The record does not support the juvenile court's finding that reasonable efforts have been made to finalize a permanency plan for Q.H. The record shows that Q.H. had an emotional disability and intellectual challenges for which therapeutic care and treatment needs were uninvestigated. Under these circumstances, more was needed than a summary conclusion that a 13-year-old special education student navigating the juvenile justice system for the first time should be committed to the DOC. *See C.H. v. State*, 201 N.E.3d 202, 205 (Ind. Ct. App. 2022) (commitment to DOC is the most restrictive sanction available and therefore should be treated as a last resort).

[26] We also find no evidence that the juvenile court considered how Q.H.'s unstable home may have affected his behavior and mental status. Q.H.'s school records showed that Q.H. was absent, late, or sick at his old school most of the month before the incident at his new school. App. Vol. II, p. 116. During that time, Q.H.'s family was homeless and spent their days with a relative and their nights at a homeless shelter.

[27] By the time of Q.H.'s dispositional hearing, Q.H.'s 16-year-old brother had multiple contacts with the juvenile justice system including two that involved alleged habitual disobedience of a parent. Q.H.'s brother was adjudicated a delinquent for trespassing and resisting law enforcement and faced two more pending delinquency petitions at the time of Q.H.'s dispositional hearing. The

pre-dispositional report in Q.H.'s case suggests that the permanency plan in his brother's delinquency proceeding a year earlier involved his brother's placement with a relative because of concerns over Q.H.'s mother's "poor compliance and unstable housing." *Id.* at 79. Yet, in Q.H.'s case, neither the pre-dispositional report nor the juvenile court's judgment reflects any consideration of the impact that Q.H.'s unstable home life had on his behavior or future rehabilitative needs.[5] The pre-dispositional report simply concludes that relative care is inappropriate because he "needs a higher level of care." App. Vol. III, p. 83.

[28] The only apparent consideration of Q.H.'s home life was in the risk assessment found in the pre-dispositional report and incorporated into the trial court's findings. The risk assessment showed Q.H.'s risk of violence was high due to his lack of support combined with stress and poor coping skills. In other words, Q.H.'s lack of family support, which seemingly was partly due to the family's homelessness, and Q.H.'s poor coping skills, which the forensic clinician linked to Q.H.'s intellectual and emotional problems, were used to justify the harshest sanction available. But those issues reasonably justified a less restrictive sanction. *Compare D.P. v. State*, 783 N.E.2d 767, 770 (Ind. Ct. App. 2003) (finding child's cognitive difficulties and mental illness were "special circumstances" justifying less restrictive sanction than DOC commitment).

---

[5] The record suggests that the Indiana Department of Child Services, which had been involved with Mother and brothers more than a decade earlier, was not currently involved with Q.H.'s family. This is despite Q.H.'s deplorable school attendance, two children in the family facing multiple delinquency petitions, and the family's homelessness.

[29] These omissions in the pre-dispositional report and juvenile court's analysis could have been corrected before the dispositional judgment, either through a continuance or court-ordered testing. Earlier in the proceedings, the probation department requested and obtained a continuance of the dispositional hearing "to identify an appropriate placement for [Q.H.] given his recent behavior in Detention." *Id.* at 168. But the pre-dispositional report reflects that the department ultimately did not investigate any possible placements outside the DOC. Q.H. learned of that omission belatedly because he did not receive the pre-dispositional report until the day of the rescheduled dispositional hearing. During the dispositional hearing, however, Q.H. requested a continuance to allow further investigation. The juvenile court implicitly denied the request, given that the court proceeded with the hearing as scheduled.

[30] The juvenile court also could have sua sponte ordered any necessary testing of Q.H. before or during the dispositional hearing. A court that has authorized the filing of a delinquency petition "may order examination of the child to provide information for the dispositional hearing." Ind. Code § 31-32-12-1(3). Such a court "may also order medical examinations and treatment of the child under any circumstances otherwise permitted by this section." *Id.*

## II. Conclusion

[31] Given this record, the juvenile court could not reasonably determine under Indiana Code § 31-37-18-6 that commitment to the DOC was the least restrictive disposition consistent with Q.H.'s best interests and community safety. We therefore conclude the court abused its discretion in committing

Q.H. at the age of 13 to the DOC for his first and relatively minor juvenile offense. Accordingly, we reverse the juvenile court's commitment of Q.H. to the DOC and remand for proceedings consistent with this opinion.

Riley, J., and Bradford, J., concur.